CLEMENT v. METROPOLITAN WEST SIDE EL. RY. CO.

(Circuit Court of Appeals, Seventh Circuit.   April 14, 1903.)

No. 942.

**1. NAVIGABLE WATERS—OBSTRUCTIONS TO NAVIGATION—BRIDGES.**

A bridge across a navigable stream is an obstruction to navigation tolerated only because of necessity and the convenience of commerce on land, and, the right of navigation being paramount, it is incumbent on the owner of the bridge to so construct it that it may be readily opened to permit the passage of vessels, to place it in charge of persons competent to operate it, and to equip it with lights and signals giving warning of its position in opening and closing, and to give timely warning to approaching vessels if for any reason it cannot be opened. A vessel having given proper signal to open a bridge, and prudently proceeding under slow speed, in the absence of proper warning to the contrary, has the right to presume that the bridge will be opened in time for passage, and is not bound to stop until it has been opened.

**2. SAME—MUNICIPAL REGULATIONS.**

The ordinance of the city of Chicago requiring the commissioner of public works to provide and maintain vessel signals on all bridges over the Chicago river, and providing that it shall be unlawful for any vessel to attempt to pass a bridge, or to approach nearer than the end of the bridge protection, while the signals are up or the bridge is opening or closing, as that the same may be injured, applies only to bridges owned by the city, and is for their protection, and does not affect the rights of vessels with respect to private bridges, nor determine what shall be prudent navigation.

**3. SAME—FAILURE TO OPEN BRIDGE—LIABILITY OF OWNER FOR INJURY TO VESSEL.**

A steamer 254 feet long was proceeding up the Chicago river at night, at a slow speed, which enabled her to stop within her length.   She passed through a number of bridges, and gave timely signal for the opening of a private bridge owned by defendant, an elevated railway company, which was raised by electrical machinery.   As she entered the draw of the next bridge below, which was 135 feet distant, it was seen that defendant's bridge was not opening, although no warning of such fact had been given, and the vessel was immediately started full speed astern, but could not be entirely stopped until she struck the bridge and was injured.   *Held,* that the vessel was not in fault, and that the burden rested on defendant to excuse its failure to perform its duty to open the bridge; that in the absence of any such showing, beyond the mere statement that the bridge could not be opened, defendant was liable for the injury.

Appeal from the District Court of the United States for the Northern District of Illinois.

In Admiralty.

This is a libel in personam by the appellant to recover damages sustained by the steamer F. H. Prince in consequence of her collision with the railway bridge of the appellee, respondent below, which spans the South Branch of the Chicago river.   This bridge is known as a "Schurzer Roller Lift Bridge," connecting the tracks of the elevated railway of the appellee on the east and west sides of the river, and is used exclusively for the passage of elevated trains.   The bridge breaks in the middle and the two halves are raised by electricity and lowered by gravitation.   Near the center of the bridge, upon four steel towers each about eight feet high, are four red lights for use in the nighttime, and four red disks for use in the daytime, two of each being on

¶ 3. See Navigable Waters, vol. 37, Cent. Dig. § 96.

the south side and two upon the north. It is the duty of the operator or bridge tender, when the bridge is about to be opened, by some mechanical arrangement to turn in the nighttime the red lights to one side away from the river, and in the daytime in a similar manner to turn the disk. The bridge is locked in the middle by sliding bolts, and these bolts, as well as the signals, the locks, and the opening and closing of the bridge, are controlled from the west tower. When the bridge is about to be opened the west towerman signals to the east towerman to throw the track switches and signals to warn approaching trains from the east. When these switches and signals have been thrown to "danger," the east towerman signals the fact to the west towerman, who then draws the bolts, thereby unlocking the bridge, turns the signal lights or disks, and raises the west half of the bridge, the other half being raised by the east towerman. This bridge was located from 125 to 135 feet south of the Jackson street bridge. There are bridges north of Jackson street at Washington, Adams, and Madison streets, but at what distance apart is not stated in the record, but concededly at a much greater distance, certainly not less than 400 feet.

About 1 o'clock in the morning of July 16, 1899, the steamer F. H. Prince left her dock at or near Washington street bridge, and proceeded south under steam up the South Branch of the Chicago river at a speed of from two to three miles an hour, her engine being set at a "dead slow check," passing safely through the Washington, Madison, and Adams street bridges. She was properly manned, and was in command of her captain, an experienced mariner, who occupied his proper position on the pilot house, the first mate and a mariner being forward on the lookout. The steamer was 254 feet in length, and at the speed at which she was going could stop in a distance equal to her length. At Adams street bridge the captain signaled for the Jackson street bridge, and, according to the testimony of the bridge tender in the west tower, when 150 feet north of Jackson street bridge signaled for the opening of the Metropolitan bridge, and the bridge tender attempted to open the bridge. At this time the red lights on the Metropolitan bridge were exhibited. There is some contradiction in the evidence, however, whether when the steamer was passing the draw of the Jackson street bridge more than one red light was exhibited; but the fact is perhaps inconsequential, and the record does not disclose how those lights were operated. As the steamer entered the draw at the Jackson street bridge the master of the steamer observed that the Metropolitan bridge was not opening, and he thereupon signaled the engineer to stop, and immediately signaled him to back and back strong; but before the headway of the vessel could be entirely checked she came into collision with the bridge, her bow passing some fifty feet under the bridge, which carried away her mast and the pilot house. The west towerman testified that he undertook to open the bridge, but was unable to do so, as the "locks would not work." There was, however, no explanation of the cause, and no signal or warning to the approaching boat was given with respect to the difficulty, otherwise than by the red signal light or lights upon the bridge.

An ordinance of the city of Chicago pleaded by the respondent below instructs the commissioner of public works to provide and maintain at the several bridges over the Chicago river and its branches, in the best and most practicable manner, vessel signals as required by the article, the signal for the nighttime to be a red lantern of such size and so placed and arranged when elevated as to be easily seen up and down the river and street. It further provides as follows: "It shall be unlawful for the owner or owners, officers or officer, or other person or persons in charge of any vessel or vessels navigating the Chicago river or its branches or any part thereof, to attempt to pass any of the bridges over the said river or its branches while said signal or signals are up or elevated, or to approach nearer than the end of the bridge protection to any of said bridges at such times, as that the same may be injured or damaged, or while the said bridges, or any of them, may be opening or closing."

Charles A. Munroe, for appellant.
Addison G. Gardner, for appellee.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

JENKINS, Circuit Judge (after stating the facts as above).  A bridge spanning a navigable river is an obstruction to navigation tolerated because of necessity and convenience to commerce upon land.  Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary, the right of navigation being paramount.  It is incumbent upon the owner that the bridge be so constructed that it may be readily opened to admit the passage of craft, and maintained in suitable condition thereto.  It is also his duty to place in charge those who are competent to operate the bridge, to watch for signals, and to open the bridge for the passage of vessels, and for the performance of such delegated duty he is responsible.  It is also his duty to equip the bridge with proper lights giving warning of the position of the bridge and of its opening and closing.  If for any reason the bridge cannot be opened, proper signals should be given to that effect, such as will warn the approaching vessel in time to heave to.  A vessel, having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage.  She is not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding (City of Chicago v. Mullen, 54 C. C. A. 94, 116 Fed. 292), but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened (Manistee Lumber Company v. City of Chicago [D. C.] 44 Fed. 87; Central Railroad Company of New Jersey v. Pennsylvania Railroad Company, 8 C. C. A. 86, 59 Fed. 192), when it becomes the duty of the vessel, if possible, to stop, and, if necessary, to go astern.

We do not think that the ordinance of the city controls the situation. We do not doubt the power of the city to regulate the local usages of navigation, or that every vessel is bound to take notice of them and conform to them so far as they are reasonable and do not conflict with any law of Congress regulating commerce or with the general admiralty jurisdiction conferred upon the courts of the United States. The Brig James Gray v. The Ship John Fraser, 21 How. 184, 16 L. Ed. 106; Escanaba Company v. Chicago, 107 U. S. 678, 2 Sup. Ct. 185, 27 L. Ed. 442; Gulf, Colorado & Santa Fé Railroad Company v. Hefley, 158 U. S. 98, 104, 15 Sup. Ct. 802, 39 L. Ed. 910; Hennington v. Georgia, 163 U. S. 299, 311, 16 Sup. Ct. 1086, 41 L. Ed. 166; City of Chicago v. Mullen, supra.  It is apparent that this ordinance was enacted for the protection of city bridges, and has reference only to the bridges owned by the municipality, the duty of maintaining lights being imposed upon the commissioner of public works.  We need not consider whether the provision of the ordinance that vessels shall approach no nearer than the bridge protection while the danger signal is up, or while the bridge may be opening and closing, is reasonable. This ordinance can have no reference to the bridge in question, for it

had no bridge protection; the ordinance manifestly applying to the bridges then owned and in use by the city and not to private bridges. The ordinance does not, if the city had the right so to order, determine what shall be prudent navigation. It did have the right to impose such reasonable condition as would prevent injury to its bridges. The question is, therefore, so far as the respondent is concerned, whether it was negligent in any duty owing to the vessel, and, so far as the vessel is concerned, whether she observed the proper rules of navigation, and whether she was negligent in placing herself in such position that collision with the unopened bridge would necessarily result.

With respect to the bridge, the signals maintained were appropriate signals to indicate the location of the bridge, and possibly the manner in which the signals were designed to be operated was proper and sufficient, under ordinary circumstances, to indicate an open or closed bridge. On the occasion in question the bridge could not be opened; but we are left in the dark with respect to the cause. The answer informs us that the bridge could not be opened, but gives no reason, nor does it inform the court why the respondent was not able to perform the duty which it owed to the on-coming vessel. It was incumbent upon the appellee by his answer to set forth specifically for the information of the court the facts which prevented compliance with duty and which would excuse nonperformance, by alleging exculpatory facts, if any, showing that inability to perform a known duty arose from no neglect of its own. This has not been done either by its answer or by the evidence of its towermen in charge. We are simply informed that the towerman was unable to open the bridge, and the counsel for the respondent below objected successfully to any statement by the towerman—called by the libelant—of the reason that he could not open it or of the difficulty with the bridge, and the towerman contents himself with saying that he could not open the bridge himself; leaving the implication either of inability in himself or of some defect which the respondent did not wish disclosed. The facts touching the bridge were peculiarly within the knowledge of the respondent and its agents, and it was its duty to fully explain the situation and to absolve itself of blame, and that burden cannot be cast upon the libelant. Failing to raise the bridge promptly when it had ample notice of the approach of the vessel, the respondent must be held guilty of neglect of duty. Failing to show that the delay was unavoidable, the presumption of negligence attaches, which it was its duty to overcome. And again, when the bridge tender found that the bridge would not open—and that was when the vessel was 150 feet north of Jackson street bridge and at least 300 feet away—in view of the situation we think it was the duty of the respondent to provide, and of the bridge tenders to give, some sort of warning signal that would timely notify the vessel of the difficulty and of the danger that was imminent, of which she could not otherwise be informed. We cannot hold the respondent absolved of fault.

Was the vessel in fault? She was proceeding under slow speed, sufficient only to give steerageway. She was approaching a bridge operated by electricity, and one that was raised quickly. She gave

the proper signal when 150 feet north of the Jackson street bridge and at least 300 feet away. Upon entering the draw of that bridge the master discovered that the Metropolitan bridge was not opening. He at once ordered the engine stopped and then reversed at full speed. The vessel could not stop, even at that slow speed, in less than its length of 254 feet. The master did all that he could under the circumstances to avoid a collision brought about through failure of the respondent to perform its duty.

We think the court erred in its decree. It will therefore be reversed, and the cause remanded, with a direction to the District Court to pronounce for the libelant for the damages sustained by the vessel.