THE LOUISE RUGGE et al.

(District Court, D. New Jersey. June 21, 1916.)

No. 1561.

1. NAVIGABLE WATERS ☞20(8)—TOWAGE ☞11(7)—BRIDGES—INJURY TO TOW FROM OPERATION OF DRAW—NEGLIGENCE OF TENDER.

A tug with a mast and derrick lighter in tow close astern, passing up the Passaic river at night, signaled for the opening of the draw of a temporary bridge, and when closer stopped and again signaled. It was not customary to give any, response signal from the bridge other than the raising of the draw which was indicated by the lights. The tug, seeing the lights rise, proceeded, but the top of the lighter's mast struck the draw, which had been stopped before reaching its full height, the mast was broken, and the vessel otherwise injured. *Held*, that the tug was not in fault, but that the collision was due solely to the negligence of those in charge of the draw in failing to raise it to full height.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 96; Dec. Dig. ☞20(8); Towage, Cent. Dig. § 19; Dec. Dig. ☞11(7).]

2. TOWAGE ☞11(7)—DRAWBRIDGES—DUTY OF TUG.

It is not the duty of the master of a tug with a tow, in passing up a river across which there are a number of bridges, to examine every draw to see that it has been fully and sufficiently operated, but, having given the usual customary signal, he has the right to assume, unless otherwise warned by signal, that the draw will be seasonably opened by those whose duty it is to operate it.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 19; Dec. Dig. ☞11(7).]

3. MASTER AND SERVANT ☞301(4)—LIABILITY FOR NEGLIGENCE OF SERVANT—SERVANT HIRED TO ANOTHER.

A contractor for replacing a public drawbridge across a navigable river, owned jointly by the counties lying on either side, was required by its contract to maintain and operate a temporary bridge while the new bridge was being built and to assume all responsibility for the safety of the public and for accidents of any kind in its operation. During the operation of such temporary bridge a vessel was injured in passing through the draw through the negligence of those charged with its operation. These were employés of the two counties who had previously operated the draw of the old bridge, and who were retained and paid by the counties, but with funds supplied by the contractor. *Held*, that, in the absence of proof of any agreement by the counties to assume charge of the operation of the temporary bridge, contrary to the terms of the contract, such employés were, while so working, servants of the contractor for whose negligence it was responsible.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1213, 1214; Dec. Dig. ☞301(4).]

4. ADMIRALTY ☞79—DISMISSAL—INSUFFICIENCY OF EVIDENCE.

Mere insufficiency of the evidence, taken in support of a libel in admiralty, is not ground for dismissal of the suit if the evidence in support of the answer supplies the deficiency.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 592–594; Dec. Dig. ☞79.]

5. NAVIGABLE WATERS ☞20(4)—BRIDGES—TEMPORARY STRUCTURE BY BUILDING CONTRACTOR—LIABILITY FOR NEGLIGENT OPERATION.

A private corporation, contracting with public authorities for the building of a bridge across a navigable stream, may erect and maintain a temporary bridge, provided due care is taken not to impede navigation,

and it cannot shift the responsibility for a violation of such duty upon the public authorities on the ground that their duty to keep the waterway clear for navigation cannot be delegated.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 86–89; Dec. Dig. 20(4).]

In Admiralty. Suit by the Clyde Steamship Company against the Louise Rugge, the Board of Chosen Freeholders of the County of Essex, the Board of Chosen Freeholders of the County of Hudson, and the Snare & Triest Company. Decree for libelant against the Snare & Triest Company.

Burlingham, Montgomery & Beecher, of New York City, for libelant.
Park & Mattison, of New York City, for The Louise Rugge.
Herbert R. Taylor, for Board of Chosen Freeholders of Essex County.
James J. Murphy, of Jersey City, N. J., for Board of Chosen Freeholders of Hudson County.
Hitchings & Burdick, of New York City, for Snare & Triest Co.

ORR, District Judge. The libelant seeks to recover damages for injuries to a lighter, The Boston, which was owned by it at the time of the collision, was in tow by the Louise Rugge at that time, and was injured by its mast coming in contact with the draw of a temporary bridge, which had been erected by the Snare & Triest Company upon the Passaic river for the chosen freeholders of Essex and Hudson counties, respectively.

The bridge was of the ordinary bascule type, and was intended to be used, and was used, during the erection of a bridge intended to be permanent, and to connect Bridge street in the city of Newark with Harrison avenue in the town of Harrison. A written contract between the Snare & Triest Company and the chosen freeholders of the respective counties, acting through a joint committee, provided for the erection of both a temporary bridge and a permanent bridge, and by its terms required the Snare & Triest Company to operate the temporary bridge and to be responsible for accident, as appears by the following provision in said contract:

"The temporary bridge is to be operated and kept in first-class serviceable condition and repair by the contractor during the progress of the entire work, and to the satisfaction of the engineers in charge. The contractor must assume all responsibility for the safety of the traveling public and will be solely responsible for accidents of any kind that may occur during the continuance of this work."

The Boston, a hand-winch mast and derrick lighter, without power of its own, square at each end, was proceeding up the Passaic river with a load of lumber in tow of the steam tug at about 9 o'clock on the night of August 14, 1912. Its mast, which was 60 feet high, struck the draw span of the temporary bridge about 1 foot from the top of the mast. This caused the mast to fall, and caused such other injuries to the lighter that a new mast, deck planks, and other repairs were required to be made. The boat was out of service, while the repairs were being made, 12 days, excluding one Sunday. The repairs,

dockage, towing, and demurrage make the aggregate of defendants' damages $826.25. Indeed the amount of the damage was not seriously contested. It is plain at the outstart that the libelant is entitled to recover damages from some one, but in ascertaining who may be responsible various questions must be considered.

[1, 2] Naturally, because the Boston was compelled to go where the tug took it, the first question which arises is whether the Louise Rugge and its owners should be held responsible. The tug and tow proceeding from the bay up the Passaic river were required to pass through a number of bridges. The night was clear yet dark, but lights and objects were visible. The tide was very nearly flood, and there was little, if any, wind. The draw span had lights to mark its position when open, and these lights were clearly visible, and were seen by those upon the tug. The tug and tow each had proper lights showing at the time of the accident. The Boston was being towed stern first by short lines from the tug's stern to each corner of the end of the lighter, and the distance between the tug and the tow was in the neighborhood of 10 or 12 feet. The tow readily followed the tug, and at the time of the collision had not touched or dangerously approached either side of the draw. While passing through the Center street draw about 2,000 feet down stream from the temporary bridge, the tug gave the proper signals and reduced her speed, and when about 1,500 feet from the temporary bridge the tug again signaled and stopped its engines and waited. A few minutes later the draw of the temporary bridge was seen to open, and the lights were seen to rise. The tug thereupon proceeded at slow speed and passed through the draw. The bridge at no time gave a signal to come ahead. It is also a fact which must be found from the evidence that those in charge of the temporary bridge did not give any signal to vessels intending to pass through the draw to come ahead other than to raise the draw span. Before the tug and tow went through the draw, those in charge of the draw span stopped their work, and when the mast and the draw span came in contact, those in charge of the draw span began again to raise it, and, so far as appears, for the first time raised it to its full height. When the draw span was raised to its full height the amount of overhand upon the channel would be 9 feet. The light on the end of the draw span, even if raised to its full height, would still be over the water. Therefore there was no duty upon those in charge of the tug to wait before proceeding through the draw until the light on the draw span had ceased to be over the water. That the change of the draw from its position when the mast came in contact with it would have to be slight to give clearance is shown by the fact that the 60-foot mast was struck at only about a foot from the top. Moreover, as the draw span had stopped in its rise before the tug and tow proceeded, the captain of the tug was justified by reason of that fact, as well as by his observation of the light on the draw, in proceeding. It is not the duty of the captain of a tug in charge of a tow, in passing up a river across which there are a number of bridges, to examine every draw to see that the same has been fully and sufficiently operated by those

whose duty it is to operate the same.   In City of Chicago v. Mullen et al., 116 Fed. 292, 54 C. C. A. 94, it is suggested by Judge Jenkins, in delivering the opinion of the Court of Appeals of the Seventh Circuit, that common sense does not demand—

"that vessels navigating the river shall heave to at each of the numerous bridges that span the river, and critically examine whether the bridge has been swung and whether it has been locked."

Nor is it required to delay proceeding until it receive some special signal from those in charge of the bridge to proceed.   The usual customary signal is all that is required; and, if the only signal to proceed is the raising of the draw, the captain of the tug cannot be deemed negligent if he proceeded, although those in charge of the draw be required by law to give some other signal.   It is the duty of those in charge of a draw to obviate any unnecessary delay to passing vessels. Central Railroad Company of New Jersey v. Pennsylvania Railroad Company, 59 Fed. 192, 8 C. C. A. 86.   In the opinion of the case last cited there is a suggestion that those in charge of the tug had a right to suppose "that the draw would be opened seasonably to permit the tug and her tow to pass."   There seems to be no doubt of the law as stated in Clement v. Metropolitan West Side El. Ry. Co., 123 Fed. 271–273, 59 C. C. A. 289, 291, in relation to bridges across navigable streams:

"If for any reason the bridge cannot be opened, proper signals should be given to that effect, such as will warn the approaching vessel in time to heave to.   A vessel, having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage.   She * * * may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened."

Under all the circumstances and in the light of the testimony viewed in every aspect, this court cannot find that there was any negligence on the part of those in charge of the steam tug which would make her or her owners responsible in this case.

[3] It is plain from the facts hereinbefore found and the law as stated that those in charge of the bridge must have been guilty of negligence.   Here it is proper to observe that no one of those who were in charge of the bridge on the night of the collision was called as a witness on behalf of any of the respondents.   The evidence shows that there were three shifts of three men each during each 24 hours while this temporary bridge was in operation.   No attempt has been made to account for the failure to call any one of the three men composing the shift on duty on the night of the collision.   An inference, therefore, must be drawn that, had they been called, their evidence would have been unfavorable either to the contractor who had undertaken to operate the bridge or to the joint committee of the chosen freeholders of the respective counties to whom the contractor had obligated himself to maintain and operate the bridge.   The evidence discloses that the men employed in the operation of the bridge

were men who had been employed by the freeholders of the respective counties in the operation of the former bridge which the new construction was to supplant, and that the contractor furnished to the freeholders of said respective counties certain sums of money to be used by such freeholders in paying the wages of the men actually operating the temporary bridge. The evidence does not disclose that there was any written contract with respect to the employment of these men, or that there was any modification or amendment to the original contract entered into for the construction of both the temporary and the permanent bridges. The contractor insists that the men were employés of the joint committee of the chosen freeholders of the respective counties, while the chosen freeholders of the respective counties insist that the men were employés of the contractor. The contractor bases its contention upon the fact that the men in charge of the bridge did not receive their wages from it, but from the chosen freeholders, and that they were neither hired nor discharged by the contractor.

The court is not satisfied that any arrangement was made between the contractor and the boards of chosen freeholders of either county whereby the duty imposed upon the contractor to operate the temporary bridge and to assume responsibility for accidents was in any way diminished. The retention of those formerly employed in the operation of the bridge to be supplanted by the new structure would probably be of some advantage to both parties. All the testimony upon this point warrants the inference that this is a case where the servants of one party are hired or loaned to another. The law is, in such a case, that they become the servants of the latter for the time being. In Atlantic Transport Co. v. Coneys, 82 Fed. 177, 28 C. C. A. 388, Judge Shipman, delivering the decision of the Court of Appeals of the Second Circuit, uses this language:

"The tendency of modern decisions is not to regard as essential or controlling the mere incidentals of the contract, such as the mode and manner of payment, * * * or whether the owner can discharge the subordinate workmen, and not to regard as essential, or an absolute test, so much what the owner actually did when the work was being done, as what he had a right to do."

In 2 Cooley on Torts, star page 624, there is this language:

"If the servants of a man are sent to work upon the property or the premises of another, they will become the servants of the latter if they work under his direction or control; otherwise not; and, where the servants of one person are hired or loaned to another, they become the servants of the latter for the time being."

In the case at bar, the Snare & Triest Company stood in the relation of an owner of the bridge which it had agreed to build and operate until the completion of the permanent bridge. It borrowed or hired, as the case may be, men in the employ of the boards of chosen freeholders. It was not bound to retain them if they neglected their duty. They were under its control. It cannot shift the responsibility for their negligent acts upon the boards of chosen freeholders of the respective counties, or either of them. The conclu-

sion is therefore reached that the respondent the Snare & Triest Company is alone answerable to the libelant for the injuries to the Boston as the result of the collision.

[4, 5] A motion to dismiss the libel was made on behalf of the Snare & Triest Company, both at the close of the argument on behalf of the libelant and at the end of the hearing. This motion was based upon two reasons: First, that the evidence taken on the part of the libelant did not disclose negligence on the part of the Snare & Triest Company; and, second, because there was an inherent duty upon the boards of chosen freeholders of the respective counties to keep the waterways clear for navigation, and that such duty could not be delegated to a private person or corporation. The court refused to dismiss the libel because both reasons upon which the motion rested appeared to be unsound. With respect to the first, the entire testimony was taken by a commissioner appointed by the court, and the entire testimony was considered to be before the court from the beginning to the end of the argument of the case. The testimony as a whole clearly discloses liability on the part of the Snare & Triest Company. The mere insufficiency of the evidence, taken in support of the averments of a libel in admiralty or of a bill in equity, has never been ground for the dismissal of the suit if the evidence in support of the answer supplies a deficiency which may exist in the evidence offered by the opposite party. With respect to the second, there seems to be abundant authority that private persons and corporations may temporarily, if not permanently, erect and maintain bridges across navigable streams, provided due care is taken not to impede navigation. It is not possible for such person, maintaining a private structure and violating his duty to navigators to shift responsibility for such breach of duty upon the governing bodies by whose act or sufferance such bridge is maintained.

There having been serious doubt as to who was the party responsible for the collision, the joinder of the respondents in this case was not improper. It therefore follows that the libelant should not be answerable for any of the costs. It also follows that those in charge of the steam tug Rugge were not in fault, and that the respective boards of chosen freeholders of the respective counties were free from fault, and therefore should not be made to pay the costs, but rather to recover them. Therefore the court, under all the circumstances, is of the opinion that the libelant recover of the respondent the Snare & Triest Company the sum of $826.25, with interest to be added from March 1, 1913, and that costs be taxed against the Snare & Triest Company, and that the libel should be dismissed as to the Louise Rugge, with costs to be taxed against the Snare & Triest Company, and, further, that the libel should be dismissed as to the board of chosen freeholders of the county of Essex and the board of chosen freeholders of the county of Hudson, with costs to be taxed against the Snare & Triest Company.

Let a decree be drawn.