THE WESTERLY.

DAILEY et al. v. WESTERLY TOWING CO.

(Circuit Court of Appeals, First Circuit. March 26, 1918.)

No. 1299.

1. TOWAGE ⊙➾15(2)—LIBEL—BURDEN OF PROOF.
    Where a canal boat, being towed by a tug through a presumably safe and well-marked channel, was grounded and sunk, the tug has the burden of excusing failure in performance of her undertaking.

⊙➾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. TOWAGE ☞11(8)—NEGLIGENCE—DUTY OF TOWING VESSEL.

Where a channel was dredged in a river, marked and opened by the federal authorities, it is the duty of a tug, towing a vessel, to keep it in the channel; but, where the vessel was grounded in the channel on a hidden obstruction, the tug is not liable.

3. TOWAGE ☞15(2)—LIBEL—EVIDENCE.

In a proceeding against a tug for the grounding of a canal boat in a channel dredged and opened by the federal authorities, a finding of the trial court that the canal boat grounded while in the main channel upon a hidden obstruction *held* warranted by the evidence.

Appeal from the District Court of the United States for the District of Rhode Island; Arthur L. Brown, Judge.

Libel by Hattie Dailey and others against the steam tug Westerly, claimed by the Westerly Towing Company. From a decree dismissing the libel, libelants appeal. Affirmed.

Pierre M. Brown, of New York City (James J. Macklin, of New York City, on the brief), for appellants.

Samuel Park, of New York City (Park & Mattison, of New York City, on the brief), for appellee.

Before DODGE, BINGHAM and JOHNSON, Circuit Judges.

DODGE, Circuit Judge. The steam tug Westerly undertook to tow the appellants' canal boat Elmer D. Walling, laden with paving stones, from Westerly, R. I., to Stonington, Conn. While proceeding up the Pawcatuck river, the tug having the canal boat lashed to her port side and projecting about 40 feet ahead of her bow, the canal boat grounded on an obstruction, which so damaged her bottom that she filled and sank thereon, with her cargo, thus sustaining the damages for which her owners seek to recover. This happened during the afternoon of November 22, 1913. The libel was filed January 10, 1914, the answer on March 10, 1914, but the case was not brought on for hearing until two years later; the trial beginning April 29, 1916. On December 18, 1916, the District Court dismissed the libel, from which decree the libelants appeal.

The canal boat was raised and taken to New London for repair by a wrecking company belonging to that place. Its operations were begun on the morning of November 26, 1913, the fourth day after the accident, and occupied two days. In them, the tug Carrie, belonging to the wrecking company, a steamer, and a lighter took part.

The testimony coming from witnesses who were on board the Westerly or the canal boat at the time the latter grounded and sank as above, or from witnesses who were on board any of the craft employed in raising her after her sinking, or from witnesses who saw her while she lay aground before her removal, as to her exact position at the time of grounding, was conflicting. Her master, on board her when she sank and present while she was being raised, one of her owners, also present while she was being raised, and the master of the wrecking company's tug Carrie, called as witnesses by the libelants, testified that she lay upon or close to the northerly edge of the dredged channel below referred to. On behalf of the Westerly, her master,

in command of her when the sinking occurred, and who visited her again on the day after the sinking, and the manager of the towing company to which the Westerly belonged, who also visited her on the day after the sinking, testified that she lay right in the channel and within a few feet of the line indicated by the government ranges as its center line. They also testified to soundings made by them around her at the time. In so locating her position, five fishermen, called as witnesses on the Westerly's behalf, familiar with the channel and living in the vicinity, who claimed to have passed near her at various times while she lay aground, agreed.

[1, 2] It is undisputed that there is a dredged channel leading from the mouth of the river up to Stonington, in which, at mean low tide, there was supposed to be a depth of not less than ten feet. The dredging had been completed and the channel opened for navigation on that assumption, by the federal authorities, during the summer of 1913. Outside this channel the bottom is rocky, the water shallow in many places, and therefore unsafe. It was the duty of the tug to keep the canal boat in the channel. If she was allowed to ground outside it, or on its edge, the tug was negligent, and therefore responsible for the sinking. The case turns, therefore, upon the question whether the canal boat, which sank, as is not disputed, upon the obstruction which stopped her, lay in or near the center of the dredged channel or on its edge.

The canal boat was drawing 8 feet 3 inches, according to her master's testimony. If there are indications that this somewhat understated her actual draft, there is nothing to show that she could not have gone safely wherever 10 feet of water, at mean low water, was to be found. An obstruction in the middle of the dredged channel, without sufficient water over it for her safe passage, would have been such an obstruction as no one could reasonably have been expected to find there, after the channel had been announced, as above, as completed and open for navigation. The master of the tug had been for many years a licensed pilot engaged in towing up the river; but he had on other occasions followed channels other than the dredged channel in the neighborhood of the place where the canal boat grounded, and was using the dredged channel at the time as a measure of extra precaution, because of having the canal boat on his port side. This was the first occasion upon which he had used it.

The tug had the burden of excusing the failure in performance of her undertaking to tow the canal boat safely through a presumably safe and well-marked channel. Boston, Cape Cod, etc., Co. v. Staples, etc., Co., 246 Fed. 549, 552, —— C. C. A. ——. It would be a sufficient excuse if the grounding was in fact caused by an obstruction in the channel over which there was not water enough for the canal boat, because her master would have been justified in believing that no such obstruction was to be found there; but it was for the tug to show the existence of such an obstruction, and therefore to show that she had the canal boat in the middle of the dredged channel when she grounded, and not outside of it or on its edge.

[3] The District Court found the tug's contention that the canal

boat struck while proceeding on government ranges, and sank wholly within the channel near its center line, supported by the preponderance of the direct testimony given by those who observed her exact location while aground after sinking. All the witnesses by whom direct testimony of this character was given testified in person before the court, with the exception of the master of the canal boat, whose deposition was taken in New York shortly before the trial. We find nothing in the record sufficient to warrant us in holding the District Court's conclusion erroneous as to the result of the testimony of this class.

Besides the above testimony based on actual observation of the canal boat's position while aground in November, 1913, there was conflicting evidence at the trial relating to various attempts to fix her then position, made long afterward, by a different method.

In April, 1916, two days before the trial began, the Westerly went to the scene of the accident, having on board, besides her master, above mentioned the master of the Carrie. Under their direction, the bottom of the 100-foot channel was searched at what was considered to be the place where the canal boat had lain aground 29 months before. There was evidence from them tending to show that the result of this search was the finding of a rock or obstruction, such as would have accounted for the sinking, about 30 feet north of the center line of the channel. The cross-examination of one of the fishermen above referred to (Clarke) also brought out testimony from him, not given in his direct examination, that he had independently made soundings at what he considered to have been the sunken canal boat's position, four days before the trial, and had there found a rock, believed by him to be that upon which she struck, 10 or 12 feet north of the center of the channel.

The hearing was continued for a joint examination of the supposed place of sinking, and this was made on Wednesday, May 3, 1916. In this the Westerly and her master took part on the respondent's behalf, and on the libelants' behalf the government engineer from New London, under whose supervision the channel had been dredged, who came there in a government launch, accompanied by the libelants' counsel. His testimony, given in rebuttal, was the only testimony regarding the results of this examination. It tended to show that he was unable to find any rock at the place indicated by the Westerly's master, though he spent several hours in sweeping and sounding there; also that he took Clarke, later on the same day, to the place, while the Westerly was still there, but found Clarke unable to show him where he could find a rock in the channel by using a sounding pole. It further tended to show that he returned alone next morning, and then found a rock 10 or 12 feet outside the northerly limit line of the channel, having over it 6.2 feet at mean low tide. But it also tended to show that opposite this rock, and nearly in the center of the channel, he found a "spot" with a minimum depth of 8.9 feet at mean low water.

Much of the argument before us has related to the reliability of the conflicting testimony regarding these examinations of the channel in 1916, and to the proper inferences therefrom, as claimed by the one party or the other. We are unable to regard it as affording a satisfac-

tory basis for any definite conclusion either for or against the contention that the canal boat grounded, in 1913, in mid-channel, and not on or beyond the northerly edge of the channel. The canal boat's actual location had become a matter of memory only. Three winters had intervened, and we cannot assume, in view of what appears regarding the general character of the material through which the channel was dredged, that its bottom in 1916 was as it had been in 1913. We think the District Court properly based its findings upon "the conflicting testimony of eyewitnesses given more than two years after the event," and the appellants fail to satisfy us that the evidence of that character required different findings, or that the conclusion reached below was erroneous.

The decree of the District Court is affirmed, and the appellee recovers its costs of appeal.