## THE NO. 9.

## THE ALEX Y. HANNA.

### (District Court, D. Delaware. June 21, 1919.)

### No. 926.

1. TOWAGE ⬿11(7)—INJURY TO TOW—COLLISION WITH BRIDGE.

    The master of a tug, proceeding with a tow toward a drawbridge which had frequently failed to operate properly, should anticipate the probable failure of the draw to open and take timely precautions to protect his tow in that event.

2. TOWAGE ⬿11(7)—INJURY TO TOW—EVIDENCE.

    That the master of a tug conveying a tow approached so closely to a drawbridge, which had frequently failed to operate properly, that he was unable to prevent damaging his tow's mast when a span of the bridge failed to fully open, *held* to establish the tug's negligence.

In Admiralty. Libel by the George W. Bush & Sons Company, owner of barge No. 9, against the steam tug Alex Y. Hanna and the members of the Levy Court of New Castle County, Del. Decree dismissing libel as to the Levy Court members, and adjudging the tug Alex Y. Hanna liable for damages and costs.

J. Frank Staley (of Lewis, Adler & Laws), of Philadelphia, Pa., for libelant.

Willard M. Harris, of Philadelphia, Pa., and Harry P. Joslyn, of Wilmington, Del., for the Alex Y. Hanna.

Frank L. Speakman and Percy Warren Green, both of Wilmington, Del., for members of Levy Court.

MORRIS, District Judge. About 2 o'clock in the morning of August 18, 1916, barge No. 9, owned by Geo. W. Bush & Sons Company, libelant, while in tow of the steam tug Alex Y. Hanna, was injured by having its mast brought into contact with the partially raised southern leaf of a bascule bridge, known as Third Street Bridge, built and operated by New Castle county over the Christiana river in the city of Wilmington, New Castle county, Delaware. To recover damages for the injury so sustained the owner of the barge filed its libel against the tug and against the individuals composing the levy court of that county. Exceptions filed by the latter were heretofore sustained, this court holding that a libel in admiralty against the county, its levy court, or the present or former members thereof, cannot be maintained. 246 Fed. 157. No negligence or fault on the part of the tow having been alleged or shown, the sole question now presented is whether the tug was at fault.

The tug having in tow, astern, on hawsers about 25 feet in length, barges No. 9 and Penn, abreast, the former being the port barge, was proceeding from the Delaware river up the Christiana river. No. 9 was about 110 feet long, 21 feet beam, and drawing about 6 feet. The Penn was of like length and draft, with beam of 26 feet. The tug

⬿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was 64.3 feet long, 15.5 feet beam, and 6.9 feet draft. No. 9 was equipped with a mast extending about 51 feet above the water. The Penn was without masts. Its house extended about 12 feet above the water. The Christiana river is a winding stream having an improved channel 200 feet in width, which is somewhat obstructed just below the bridge in question by the Wilson Line boats lying at their wharf on the north side and by a yacht on the south side. Third Street Bridge was at the time of the accident a new bridge, having been in use only about 18 months. Its draw consisted of two leaves, each 75 feet in length, opening from the center upwards by electric motors operated by a bridgetender. At or near the end of each leaf, the center of the draw, there was a light showing red when the bridge was closed and green when the leaf was raised beyond a certain height. The abutments were marked by lights thereon near the water. There was no overhang of the leaves when the draw was completely open, and the two green lights would, with the leaves in that position, appear at an elevation on each side of the opening and directly above the abutment lights. The clearance of the draw at the water level was 145 feet. About 15 feet upstream from the draw and towards the northern bank stood the unlighted center abutment of the former county bridge, extending 2 or 3 feet above high-water level and probably from 45 to 50 feet within the northern line of the draw extended. It was a clear moonlight night, and objects and lights were clearly visible. Tide was flood and within one to two hours of high water. The tide through the draw was practically straight, with possibly a little set toward the south. There was little, if any, wind. No other shipping was moving near the bridge.

As the tow approached the bridge, the tug, by three blasts of her whistle, signalled the bridgetender to open the draw. The bridgetender answered with a signal of one blast of a whistle, indicating the stopping of bridge traffic, and the tug slowed down and continued under slackened speed until the bridgetender, after the bridge began to open, made further answer by three blasts, whereupon the tug immediately increased her speed and proceeded to pass through the draw. It appears from the testimony of the bridgetender that the signal of three blasts from the bridge was given after both leaves had stopped rising, when the tug was about opposite the Jackson & Sharp shipyard, about 1,200 to 1,500 feet below the bridge. The testimony of the barge captain is that the leaves stopped rising when the tug was about 800 feet away. The master of the tug testified that, when the three-blast signal was given from the bridge, he "would come to the bridge in a minute," and that he was so near that the roof of the pilot house intercepted his view of the green lights while they were still rising; that he did not see the lights stop going up, but that he "was working on the bridgetender's instructions that everything was clear." He further testified that when the green lights passed out of the line of his vision he could not have done anything, other than what he did do; that he "was getting too close." As the tug and tow were going through the draw, the mast of No. 9 struck the southern leaf, the one

on the port side of the tug and tow, breaking off the mast, and otherwise injuring the barge. The bridgetender had, pursuant to instructions given to him the evening before, stopped raising the southern leaf when it had gotten up about two-thirds of the way, in order to protect a scaffolding erected about its understructure for the purpose of making certain repairs to an operative part of the bridge. These repairs had been going on about a week. The bridgetender gave to the tug no signal of his intention to stop raising the southern leaf before it had reached its full height.

Shannon, captain of barge No. 9, Banks, master of the tug Meteor, Davis, master of the tug Martha, and White, the bridgetender, witnesses for the libelant, testified to the effect that the draw had been very undependable; that sometimes one leaf would rise and the other would not, and that at other times one leaf would go all the way up and the other leaf only part way. This testimony is not only not disputed by the respondent, but is corroborated by at least two of his witnesses, namely, Capt. Blocksom and William Cobb, steward of the tug Alex Y. Hanna, the latter of whom testified:

"I have never seen the spans up but once since we have been going through it, and I have been going through it ever since it was there."

It also appears from the evidence that this failure to operate would occur after the giving of the three-blast signal by the bridge. Furthermore, under the regulations prescribed by the Secretary of War to govern the opening of drawbridges for the passage of vessels, which are in evidence, the three-blast signal from the bridge is not a signal that the bridge is opened, but a signal that the draw is ready to be opened immediately. It further appears that the master of the tug Alex Y. Hanna had been going through this bridge with his tug almost nightly for six or seven weeks immediately preceding the accident, and more or less frequently before that time, and consequently was chargeable with knowledge of the imperfect functioning of the bridge.

[1] What, under such circumstances, do prudent navigation and reasonable care require on the part of the master of a tug with vessels in tow? Clearly, to anticipate the probable failure of the draw to open, or its failure to open sufficiently for the passage of the tug and tow, and to take such timely measures of precaution as would enable him to protect his tow, should either of those events occur. This is not only required by the law, but had been observed in actual practice by tug boat captains when approaching the Third Street Bridge, as appears by the testimony of Capts. Banks and Davis. Such imperfect functioning of a bridge and knowledge thereof by the master of a tug prevent a reliance by him upon an assumption that the bridge will be timely opened for passage, or even an acceptance by him of the three-blast signal and the upward motion of the leaves of the bridge as an assurance of a sufficient clearance for the tow, and distinguish this case from The Louise Rugge (D. C.) 234 Fed. 768, and 239 Fed. 458, 152 C. C. A. 336; Clement v. Metropolitan West Side El. Ry. Co., 123

Fed. 271, 59 C. C. A. 289; City of Chicago v. Mullen, 116 Fed. 292, 54 C. C. A. 94, and similar cases.

[2] Did the master of the tug exercise the required care? The crucial factor in this inquiry is whether, when the southern leaf of the bridge stopped going up, the position of the tug and tow was such as to enable the master of the tug, by the exercise of reasonable care, to save his tow from injury. If the position of the tug and tow was then such as to enable the master of the tug, by the exercise of reasonable care, to save his tow from injury, and he failed to exercise such care, and the injury to the tow was caused thereby, the tug was at fault. But I am not satisfied from the evidence that, after the southern leaf of the bridge stopped going up, anything more than was done could have been done to save the tow from injury. Palmer, master of the tug, states that nothing could then have been done, other than what was done, to prevent the mast of the barge from striking the bridge; that he was getting too close. As the tide was flood, the channel of the river just below the bridge narrow, and obstructed on one side by the Wilson Line boats and by a yacht on the other, and the channel through the draw restricted by the unlighted abutment of the old bridge, I am not inclined to question this statement of Capt. Palmer, but accept it as the fact. This fact, however, discloses that the position of the tug at the moment the leaf stopped rising was one of danger to the tow. Assuming the master did all he could at the moment to prevent the accident, yet "this will not excuse him, if, by timely measures of precaution, the danger could have been avoided." The Syracuse Steamer, 12 Wall. 167, 172, 20 L. Ed. 382; Great Lakes Towing Co. v. Shenango S. S. Transp. Co., 238 Fed. 480, 487, 151 C. C. A. 416.

Could the danger have been avoided by timely measures of precaution? This is hardly open to question. The lights of the bridge indicating the position of the draw were visible to those in charge of the tug when she was at least 1,500 feet away, and thereafter remained in full view. There was then and for some time thereafter ample opportunity for those in charge of the tug to take the protective measure shown by the evidence to have been frequently taken by tugs with a tow in approaching this bridge, namely, to turn around. Neither this nor any other sufficient precaution was taken. The tug elected to proceed and did proceed with her tow into a position of danger before the bridge lights showed a sufficient clearance through the draw for the tow. It follows that the tug was at fault and must be held liable for the damage to the barge.

As under a stipulation of proctors, approved by the court, no decree pursuant to the opinion heretofore filed in this case has been entered dismissing the libel against the levy court commissioners, there should now be a decree dismissing the libel as to the individuals composing the levy court of New Castle county, and adjudging the tug Alex Y. Hanna liable for the damages and costs.

An interlocutory decree may be prepared and submitted.