## THE S. S. BELLATRIX.

## UNITED STATES v. MARTIN et al.

No. 7304.

Circuit Court of Appeals, Third Circuit.

Oct. 3, 1940.

J. Cullen Ganey, U. S. Atty., and J. Barton Rettew, Jr., Asst. U. S. Atty., both of Philadelphia, Pa., and J. Frank Staley, of Washington, D. C., for appellant.

Howard H. Yocum and Biddle, Paul, Dawson & Yocum, all of Philadelphia, Pa., for appellees.

Before BIGGS, JONES, and GOOD-RICH, Circuit Judges.

JONES, Circuit Judge.

The United States, as the chartered owner of the steamship Bellatrix, filed a libel in admiralty against P. F. Martin, in personam, and three tug boats, in rem, for damages to The Bellatrix alleged to have been suffered through the negligence of the respondents. The court below, having found against the libellant on the charges of negligence, entered a decree dismissing the libel. The present appeal followed, the libellant assigning for error the trial court's findings, conclusion and decree. A recital of the material facts, therefore, becomes necessary.

An authorized agent of the United States Shipping Board Emergency Fleet Corporation, which operated The Bellatrix, instructed the respondent Martin, who was engaged in the towing business, to send three tug boats to tow The Bellatrix from a shipyard on the Christiana River in Wilmington, Delaware, to a dock in Philadelphia. The work was to be done on an hourly basis. Martin dispatched the tugs which arrived alongside The Bellatrix about 3 o'clock in the afternoon, and Captain Bishop, master of the tug Caspian, became the pilot in charge of the tow. The Bellatrix was "dead", that is, without power of her own. Because of a squally wind at the time, the tow was not commenced immediately. About 5 P. M., the wind having subsided somewhat, Captain Madsen, the master of The Bellatrix, and Captain Bishop concluded that the weather conditions were favorable. Madsen also consulted by telephone with the marine superintendent and representative of the Emergency Fleet Corporation at Philadelphia, whereupon he told Bishop that "it was all right to go ahead" and that "he [Madsen] thought it was safe". He also asked Bishop for his opinion and Bishop concurred with Madsen. Thereupon the tow was begun.

In proceeding downstream from the shipyard, it was necessary for the tow flotilla to pass through the draws of several bridges in Wilmington. One of these draws was at Third Street Bridge, which first comes in sight after a bend in the river has been rounded about two thousand feet above the bridge. When the tug Bristol, which was leading the flotilla by the length of her twenty-five to thirty fathom towline, attached to the bow of The Bellatrix, had rounded the bend, she blew a signal for the opening of the draw. The bridge tender responded with a signal which indicated that the draw would be opened immediately; and, shortly, the draw began to open. At the time, the tide was flood and the flotilla was proceeding at not more than two knots per hour.

Third Street Bridge was a bascule type, consisting of two leaves which, when in horizontal position, constituted the floor of the bridge for highway traffic. The leaves rested, respectively, upon abutments of the bridge on either side of the river, and were raised simultaneously, or nearly so, by motors operated by the bridge tender. In the lifting of the draw, the leaves rose at the middle of the bridge with the abutments in the relation of fulcrums, so that, when the draw was fully opened, the leaves stood in a vertical position with no part overhanging the waterway beneath. The width of the river between the bridge abutments was one hundred forty-five feet, giving ample clearance, when the draw was open, for a flotilla such as The Bellatrix and her accompanying tugs.

When The Bellatrix was about five hundred feet from the bridge, the master of The Bristol, observing that, while the leaf on the lefthand side of the draw had then reached a vertical position, the other leaf had come to a stop at an angle of from forty-five to sixty-five degrees, blew for a further opening of the halted leaf, which the bridge tender answered by gesticulating in apparent effort to indicate that he was unable to raise that leaf higher. About the same time, a squall struck The Bellatrix broadside on the port. Captain Bishop, perceiving that the righthand leaf continued to overhang the waterway and that, because of the wind, The Bellatrix might come into collision with the leaf, ordered full speed astern and a certain steerage maneuver on the two tugs which, for the purpose of the tow, were warped to either side of the bow of The Bellatrix. Nevertheless, the momentum of The Bellatrix carried her into the open draw, where a yard arm of the mast struck first near the outer end of the partly opened bridge leaf. The smoke-stack then came into contact with the bridge leaf and was bent partly backward before the vessel was brought to a full stop. When stopped, The Bellatrix drifted to leeward, where a portion of her starboard bulwarks was crumpled against the framework of the righthand bridge leaf.

The decree below dismissing the libel was the logical result of the trial court's findings which directly negatived the libellant's allegations of negligence. While we are free in a case such as the present to pass upon the facts de novo (The Piankatank, 4 Cir., 87 F.2d 806; Lillig v. Union Sulphur Co., 9 Cir., 87 F.2d 277), the findings of the trial judge are entitled to great weight. The Gezina, 4 Cir., 89 F.2d 300; The Piankatank, supra; Lillig v. Union Sulphur Co., supra; The James Griffiths, 9 Cir., 84 F.2d 785; Leathem Smith-Putnam Navigation Co. v. Osby, 7 Cir., 79 F.2d 280, certiorari denied 296 U.S. 653, 56 S.Ct. 370, 80 L.Ed. 465. In any event, there could be no justification for disturbing the findings whereon the decree below is based. They are fully supported by the evidence and, independently, we should have found to like effect.

The appellant contends that the injuries to The Bellatrix were due to the negligence of the respondents, in that the pilot of the tow (1) brought The Bellatrix, a "dead" ship, into collision with an immovable structure or object, (2) knew or was bound with knowledge that the draw of Third Street Bridge functioned imperfectly, (3) began the tow in the face of a possible squall which, as the libellant asserts, is characteristic locally of the wind (northwest) which was then prevailing, and (4) maneuvered The Bellatrix imprudently after the emergency arose. We find no merit in any of these contentions.

In the cases[1] cited by the appellant where there was ensuing liability for bringing the craft into collision with an immovable object, such was in fact the precise condition. All but one of the cases cited involved the stranding of a tow; the remaining case involved the striking of a rock. The bed of navigable waters and the rocks located therein are indeed fixed, and to the mariner's knowledge, but such is not the case with the movable parts of a drawbridge. Its very purpose is that it may be moved out of the ship-way of the water course. The non-marine traffic which crosses over a drawbridge is subservient to the demands of navigation on the waters beneath. A ship may, therefore, proceed on her course toward a drawbridge upon the assumption that the draw will be opened timely, especially where, as in the present case, the ship signals punctually for the opening and is answered affirmatively by the draw tender. Nor is a ship under any duty to stop before reaching a drawbridge in order that an examination may be made to determine whether the draw is operating efficiently. Clement v. Metropolitan West Side Elevated Ry. Co., 7 Cir., 123 F. 271; The Louise Rugge et al., D.C., 234 F. 768; City of Chicago v. Mullen et al., 7 Cir., 116 F. 292; see The Kard, D.C., 38 F.2d 844. This, of course, does not mean that a master may steer his ship deliberately into a closed draw in utter disregard of the condition. But it does mean that he may proceed carefully on his course toward a draw and assume that those charged with giving him ship-way will perform their duties properly and that the mechanical devices which they are to operate for that purpose will also function properly.

---

[1] The Reichert Line, 2 Cir., 64 F.2d 13; The Wyomissing, 2 Cir., 228 F. 186; The Westerly, 1 Cir., 249 F. 938; and W. G. Mason, 2 Cir., 142 F. 913.

In order to establish that the Third Street draw functioned imperfectly and that Captain Bishop had knowledge of such condition, the appellant relies on the case of The No. 9, the Alex Y. Hanna, D. C., 258 F. 693, which involved a collision at the same draw some two and a half years earlier. In the No. 9 case there was undisputed evidence that the draw was faulty and that the master in that case knew of the condition, while, in the instant case, the court below found from competent and sufficient evidence that "The managers of the tow had no reason to know and did not know, that the draw of the bridge * * * would not open upon signal before the tow reached the bridge". It may not be said that the accident involved in the No. 9 case, happening as it did more than two and a half years before, could serve as legal notice of inherent fault in the draw. To so hold would be to put a premium upon defective apparatus for use in exacting and obviously hazardous circumstances.

The appellant may not now complain that the tow was undertaken while a wind was blowing. The weather conditions were the subject of prior consideration which indicated care, and the start was delayed until the wind had diminished. And, when the tow was begun, it was pursuant to assent from the master of The Bellatrix and the marine superintendent and representative of the Emergency Fleet Corporation. Control to such extent remained in the owner. A contract for tow is sui generis and the only control surrendered to the tugs and their pilot is such as is necessary for the towage. Not being a bailment, there was no contractual obligation upon the respondents to deliver The Bellatrix in the condition in which she had been received. The extent of their liability for damages to The Bellatrix was for negligence, proven and not implied by legal presumptions. See generally Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699, and cases there cited.

The appellant's remaining complaint is that the pilot of the tow, faced with the emergency caused by the drifting of The Bellatrix toward the leaf not fully raised, maneuvered the flotilla imprudently. It is sufficient to point out that the evidence shows that the pilot, although required by the circumstances to act promptly under stress, followed precisely what other seamen confirmed in retrospect as having been the one proper course open to him. Negligence in fact does not lie in such conduct, nor is it to be presumed as a matter of law. Even if the pilot had not acted thus competently, the question of negligence would still be resolved in the light of the circumstances. At no time would he be required to choose the best way out. And, when faced with an emergency, negligence does not flow from mere errors in judgment. The apprehension of possible collision is not likely to foster the clearest foresight. The Mary T. Tracy, D.C., 298 F. 528, 530; The Lafayette, 2 Cir., 269 F. 917, 925. As the trial court correctly found, the pilot was not guilty of negligence.

The decree of the Court below is affirmed.