## ANGOLA TRANSFER CO. v. TEXAS & P. RY. CO.

(District Court, E. D. Louisiana. July 7, 1926.)

No. 14631.

1. **Navigable waters** ⬤⟹20(2)—**Construction of railroad bridge over navigable stream held unauthorized (31 Stat. 1089).**

Filing for approval of War Department map, showing profile and soundings for railroad bridge over navigable stream and qualified approval of specifications nearly 15 years after construction, held not sufficient compliance with 31 Stat. 1089, authorizing construction, so as to release railroad from liability for injuries sustained by vessel passing through draw.

2. **Navigable waters** ⬤⟹20(7).

Under Act July 5, 1884, c. 229, § 8, owner of bridge over navigable waters has burden of providing and maintaining safe means of passage for vessels between piers (Comp. St. § 9969).

3. **Navigable waters** ⬤⟹20(8).

Railroad bridge, with projecting circular blade from face of pier, unprotected by bulkheads and covered by water during high stages, held dangerous agency, menacing safety of navigation.

4. **Navigable waters** ⬤⟹20(8).

Vessel competently manned, and in charge of pilot familiar with current, held not guilty of contributory negligence when striking projection from bridge; it being necessary to pass close to pier because of diagonal currents.

5. **Navigable waters** ⬤⟹20(8).

Rubbing of bridge piers by vessel in passing through draw is not evidence of fault in navigation or of negligence.

6. **Navigable waters** ⬤⟹20(8).

Vessel has right to clear, unobstructed passage through bridge over navigable stream and to necessary flanking bulkheads, with smooth surfaces, parallel with current.

7. **Navigable waters** ⬤⟹20(8).

Any obstructions in draw in bridge over navigable stream are danger for which owner is responsible, when they cause injury to vessel.

In Admiralty. Libel by the Angola Transfer Company against the Texas & Pacific Railway Company. Decree for libelant.

John D. & M. A. Grace, of New Orleans, La., for libelant.

Spencer, Gidiere, Phelps & Dunbar, of New Orleans, La., for respondent.

BURNS, District Judge. Libelant, as owner of the steamboat William Edenborn, claims damages for the total loss of that vessel, caused by rubbing against a steel cap projection extending over the top of a pier supporting a railroad bridge over Old river, a connecting link between Red river and the

Mississippi, in Louisiana, on the morning of May 5, 1912.

The libel alleges that the steamboat was 142.5 feet long by 31.7 feet wide by 6 feet depth, and was light, staunch, and strong, well, and sufficiently tackled, appareled, and equipped, with a full and sufficient crew, and worth $28,000; that she had a barge in tow, such as she had frequently handled on numerous voyages from Naples, La., through Lower Old river to Angola, La., on the Mississippi river; that her tow, consisting of said barge, was lashed on her port side forward of amidships; that she was proceeding cautiously, handled in seamanlike manner, when she arrived near or at the bridge belonging to defendant, through which she was to pass; that this bridge constituted an unreasonable obstruction to the free navigation of said river, which is one of the navigable waterways of the United States, because of a projection of an iron cap plate, extended from the upper pier, known as pier No. 1, located on the south side of the south draw, forming a very dangerous obstruction in the waterway; that the pier was upright, round, or cylindrical in form, with this projecting iron securely attached to its top and extending some six inches as a circular blade sufficiently powerful to sheer into the hull or side of any boat that might rub against it, as evidenced by the fact that it did sheer into the side of the William Edenborn, cutting or ripping a hole some 16 or 18 feet long, along the starboard side of her hull abaft her boiler room, so that she sunk in eight minutes; that this menacing construction had been placed there by the defendant railway company long prior to the accident, notwithstanding its manifest danger to navigation; that, at the then exceedingly high stage of the water, the top of the pier was submerged some 6 inches, so that one-half its diameter projected out in the stream, with this iron cap projecting as a cutting blade some 6 inches beyond its rim.

The Texas & Pacific Railway Company, respondent, in effect denies the charges contained in the libel; alleges that, on the contrary, the bridge and its location was authorized by an act of Congress, its plans approved by the Secretary of War, and its construction lawful and in accordance with that approval and authority. It denies specially that the bulkheads of the bridge are not parallel with the current of the river, and alleges that they are absolutely in line and parallel with the current under usual and normal conditions, and under the conditions existing at the time of the building of the bridge. It

denies specially that it was ever required to build and maintain bulkheads or fenders, except on the draw span or pivot pier above and below the bridge, although this seems covered to the contrary by an admission in article 7 of the answer; that no such bulkheads or fenders were required to be constructed to the west of the south rest pier or pier No. 2, or any bulkhead on the north rest pier, or pier No. 4, or that there was any defect of construction or failure of construction, and that, on the contrary, the structure was entirely lawful, and finally that, on information and belief, the steamboat William Edenborn was sunk, not through any fault of respondent, but because she was insufficiently manned, and that, at the time of the accident and sinking, the pilot of said steamboat had his wife with him in the pilot house, and was grossly inattentive to his duties; that at the time the steamboat was lost it was full daylight, in calm weather, with only a slight breeze blowing, and a current of only 2 miles an hour; that the opening in the draw span through which the William Edenborn was being navigated presented an open space of over 163 feet; and that, if that steamboat ran into the south pier of said bridge, the fault was entirely with libelant and in no wise with respondent.

The negligence alleged in this case relates to a comparatively minor detail of the bridge construction. The liability of the defendant depends primarily on whether or not the projecting flange of the pier cap was such a structure as presented an element of danger to water craft, menacing their safety, and therefore constituting such legal wrong as would subject the wrongdoer to legal liability for the direct consequences. Correlated to this is the question whether or not defendant was negligent in failing to bulkhead or fender the draw span rest piers, or to provide some temporary protective device during the unusual high water prevalent at the time of the accident, to protect vessels from the projecting flange and fend off such vessels as might rub or touch the pier in passing through the bridge.

[1] Since the respondent sets up primarily the defense that the construction was according to the authorization of Congress and the approval of the Secretary of War, the first question presented is whether or not such preliminary action and approval operate to release defendant from liability.

Section 2 of the act authorizing the Texas & Pacific Railway Company to construct a bridge across Red river, La. (31 Stat. 1089), prescribes first that the bridge should

be "suitable to navigation." In section 2: "That said bridge shall be so constructed that a reasonable, free, and unobstructed passageway may be secured and maintained by proper draws to all water craft navigating said river. * * *"

In section 3: "That said bridge shall not be built or commenced until the plans and location of the same shall have been submitted to and approved by the Secretary of War; that no change shall be made in this construction, and no alteration of it after its construction, unless such change or alterations shall in like manner receive the approval of the Secretary of War. * * *"

Section 4: "That the Secretary of War upon receiving the designs, drawings, and specifications of said bridge, and a map of the location, and such other information as he may call for, and upon being satisfied that the bridge, when built according to such designs and drawings, will be in accordance with the requirements of this act and will not unreasonably obstruct the navigation of said river, be, and is hereby, authorized and directed to approve said designs, drawings, and specifications, and to so notify the said railway company, and upon receipt of such notification the said railway company may proceed to construct said bridge, conforming strictly to the approved designs, drawings, and specifications."

Section 6: "That said bridge built under this act and subject to its limitations shall be a lawful structure and shall be recognized and known as a post route, upon which also no higher charge shall be made for the transmission over the same of the mails, the troops, and munitions of war of the United States than the rate per mile paid for the transportation over the railroad or public highways leading to the said bridge, and shall enjoy the rights and privileges of other post roads in the United States; and equal privileges in the use of said bridge shall be granted to all telegraph and telephone companies, and the United States shall have the right of way across said bridge and its approaches for postal telegraph and telephone purposes." .

From the photostat copies of documents in the War Department, certified by the Chief of Engineers, United States Army, it appears that there was originally filed for approval only a map, showing the profile and soundings for the bridge, together with a "general plan," whereas section 4 of the Act of Congress prescribed that the "specifications" as well as the design, drawing, and a map should be submitted. It also appears that, under date September 4, 1901, the acting Secretary of War certified a conditional approval of "designs and drawings and a map of the location of a proposed bridge," but said nothing of specifications. The nearest approach to specifications appearing in the papers submitted for approval is contained in a legend on the map, which reads as follows:

"Total length of span: 1 draw span, 360', 2 end spans, 200' each. Piers for bridge: Cylinder filled with concrete for draw span. Dimensions: 4 piers of two 8' diam. Cylinders filled with concrete for fixed spans. Diameter of draw pier to edge of turntable rest, 25'00". Clear span on each side of draw pier, 163'60". Total clearance, 327'00". Inside clear widths of spans 15'00". Clearance of spans overhead 22'-00". Elevations: Base of rail above high water 8'0". Top of pier to base of rail, ———. Elevation high water to bottom chord of bridge 3'10"feet."

The conclusion is irresistible that, whilst the act of Congress contemplated that the Secretary of War should examine the specifications, by which such minor details as the pier cap might be examined for approval, he did not see any such specifications as would have disclosed such minor details of construction.

By its terms, the act of Congress, in section 5, provided that it should be null and void if the actual construction of the bridge were not commenced one year from the date of approval, or completed within three years from the date of the act, which was March 3, 1901. It is significant, therefore, to note from another certified file of the War Department in the record that the approval by the Secretary of War for the completed bridge was not either applied for or obtained until May, 1915, and this on the application of the defendant railroad company, requesting a statement that their bridge over Red river had been built in accordance with the permit issued in 1901. This application was undoubtedly made because of the pendency of this proceeding, which had then been filed some three years before. The approval itself, being qualified by indorsements of the Chief of United States Engineers, under date May 5, 1915, is significant and pertinent here:

"The district engineer's office states that he has made measurements of this bridge and finds that the permit has been complied with throughout, subject to the following exceptions:

"On the Torras side of the draw the clear

opening is 163 feet 6 inches between the angle iron surrounding the head of the pier next to the shore and the pier on which the draw span rests, inside of the 163 feet 6 inches between the faces of said piers, etc. * * *

"It appears to me that the permit has been complied with as closely as is possible."

Fourth indorsement: "In view of the fact that the bridge as completed conforms to the requirements of the instrument of approval, with the exception of the minor features referred to, and in view of the statement of the district officer that the permit has been complied with as closely as is possible, it is recommended that the bridge be accepted as a sufficient compliance with the plans of September 4, 1901," etc.

The answer of respondent contains an admission in article 7 that the conditional approval of plans contemplated that a bulkhead be constructed to protect the draw span rest pier, and that this bulkhead, parallel with the current, was not built.

The conclusion upon this contention of respondent is that the War Department specifically noted as an exception the projection into the clearway of the angle iron surrounding the head of the pier when the construction was submitted for approval, long after the event and after this suit was filed; that the bulkheads or fenders designed to fend off vessels from the pier were never constructed as contemplated by the original conditional approval of plans.

The record also discloses that on March 22, 1910, two years before the accident, the respondent railway company was ordered by the War Department to construct "a certain guide wall at the draw span rest pier of the south draw span, 300 feet long, extending toward the Mississippi river; such guide wall to be substantially built," and "to present a surface toward the channnel with no projection which would injure a boat that might rub along it." This of itself indicates that the respondent was at least put on notice of the danger of projections that might damage water craft, and of the importance attached to such projections by the War Department in the supervision of bridge construction over navigable waterways, and in recognition of the paramount rights of navigation.

In Clement v. Metropolitan W. S. Ry. Co., 125 F. 271-273, 59 C. C. A. 289, 291 (C. C. A. 7th) the court said:

"A bridge spanning a navigable river is an obstruction to navigation, tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary, the right of navigation being paramount. It is incumbent upon the owner that the bridge be so constructed that it may be readily opened to admit the passage of craft, and maintained in suitable condition thereto."

In Gould on Waters (3d Ed.) p. 268, it is said:

"Where the passageway for vessels between the piers of a drawbridge across navigable waters is required to be of a certain width, a clear width of the entire distance must be left across the channel."

By the Act of July 5, 1884, c. 229, § 3 (Comp. St. § 9969), Congress specifically required the Secretary of War to require the owners of bridges to cause, at their expense, such aids to be constructed to the passage of the draw opening in the form of booms, dikes, piers, or other suitable and proper structures for the guiding of rafts, steamboats, and other water craft safely through such opening or span.

[2] It would therefore seem to follow that the burden of providing and maintaining safe means of passage is placed squarely on the owner of such bridges. Whether the Texas & Pacific Railway Company, through error or oversight, or from any other cause, failed to seek approval of the construction until after the accident, or whether the War Department, through error or omission, failed to examine, inspect, or discover and correct the fault in the bridge in question, such errors of either or both cannot relieve the owner of responsibility.

[3] The evidence convinces me that the bridge was ordinarily, in usual stages of the water in the river, safe, but that during high stages of water in the river this projecting circular blade, three-fourths of an inch thick, extending 6 inches or a little less over the fairway from the face of the cylindrical pier, which, in turn, was not protected by the necessary bulkhead to receive the rub of and help guide water craft safely through the opening became an unsafe, dangerous agency, menacing the safety of navigation particularly when submerged. During the extraordinary high stage of the river on the day of the accident, and for several days previously, this pier and cap being submerged several inches and at a point one-half the diameter of the cylindrical pier, or say 4 or 5 feet from the end of the stationary bridge and rail ends extended from shore, the danger was all the more augment-

ed. If there were any doubt that the continuance of this iron projection constituted negligence per se, there can be little doubt remaining when there is superadded the failure of respondent to have placed some temporary fender or bulkhead or timber across the face of the pier as a measure of safety during that particular period. Convincing testimony in the record shows that, under the circumstances obtaining as of that date, mere reasonable care or prudence would have dictated some such expedient.

[4] There is no evidence to sustain the contention that there was a contributory fault on the part of the vessel, its pilot or crew. The vessel was fully and competently manned, and was handled in seamanlike manner. The pilot was very familiar with the current, which tended to set diagonally across the river at the draw, the bridge being located in a long bend which naturally made such deflection. Knowing this, the pilot headed his tow toward the pivot or draw span pier. With the barge alongside, the tow and tug were some 80 feet in width, and more than 100 feet long. Whilst there was but little wind velocity, a mere breeze, and the current at not more than 2 or 3 miles per hour, there was but some 80 feet of clearance. He was justified in proceeding as he did. The sheer of the barge and steamboat tug was toward the pier, which was not flanked by fenders against which to rub, and from which he tried to hold her and partially succeeded, as is shown by the fact that the submerged iron bladelike projection ripped the steamboat's starboard hull from a point abaft her engine room toward one near to the stern.

[5-7] Such rubbing of bridge piers is not evidence of faulty navigation or of negligence. The cases cited, as well as the act of Congress, recognize the disadvantage of water craft in negotiating the draw spans of bridges, and their paramount right of navigation, as we have seen. The law not only recognizes the vessel's right to a clear, unobstructed passage, but to the necessary flanking bulkheads, with smooth surfaces, parallel with the current against which it may be rubbed and safely guided through at the expense of the owner of the obstructing bridge. Further authorities, more or less analogous, are all to the effect that any obstructions in a draw are deemed a danger for which the owner is responsible, and, when they cause injury to a vessel float, constitute a maritime tort. North American Dredging Co. v. Pacific Mail S. S. Co., 185 F. 701, 702, 107 C. C. A. 620; The J. G.

Lindauer (D. C.) 158 F. 449; P. W. & B. R. R. v. Philadelphia & Havre de Grace Steam Towboat Co., 23 How. 209, 16 L. Ed. 433.

The libel prays for judgment in the sum of $28,000, with interest from May 5, 1912, the date the William Edenborn was destroyed. Something more than this value was proven, and there was no contradiction of the value. Accordingly, a decree may be entered for libelant as prayed for.