(No. 4669- )

J. E. VICKERS AND F. N. BYRD, CO-PARTNERS, *d/b/a* DELTA TOWING COMPANY AND WESTCHESTER FIRE INSURANCE COMPANY, A CORPORATION, AS SUBROGEE, Claimants, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed January 14, 1958.*

BRADLEY, PIPIN, VETTER AND EATON, Attorneys for Claimants.

LATHAM CASTLE, Attorney General; BERNARD GENIS, Assistant Attorney General, for Respondent.

WHAM, J.

This is a claim by J. E. Vickers and F. N. Byrd, Co-Partners, d/b/a Delta Towing Company, and the Westchester Fire Insurance Company, A Corporation, as subrogee, to recover the total sum of $1,375.29 for damages done to radar equipment of the motor towboat, Nita Dean, which collided with the Ruby Street Bridge, a draw bridge maintained, operated and controlled by respondent over the Illinois waterway at Joliet, Illinois, on November 24, 1953.

Claimants contend that the bridge tender, employed by the State of Illinois, negligently failed to give a proper signal that the bridge opening would be delayed in sufficient time to warn the pilot of the Nita Dean of such fact, thereby causing the collision in question.

Respondent contends that the bridge tender gave all signals required of him by the pertinent regulations governing the operation of draw bridges over navigable streams; that the pilot of the Nita Dean failed to comply with signals; that the bridge tender acting in an emer-

gency was not negligent; and the pilot of the Nita Dean negligently caused the collision. Respondent in its answer neither admitted nor denied the occurrence of the collision, and, on oral argument, questioned whether it happened at all.

Only two witnesses testified to the occurrence, namely, James Elmer Flanagin, pilot of the Nita Dean, for claimants, and Harold Johnson, the bridge tender, for respondent.

Flanagin testified that he had been a river boat captain for ten years, a pilot for sixteen years, and held an operator's license issued by the United States Government. On November 24, 1953, at 4:30 P. M., he was piloting the Nita Dean, which was pushing two barges, end to end, loaded with petroleum products destined for New Orleans, south and downstream on the Illinois waterway approaching the Ruby Street draw bridge. The Nita Dean was approximately 84 feet long and 26 feet wide, and had a radar screen installed ahead of the front mast at such height that it could not pass under the bridge. The two barges totalled approximately 400 feet in length.

The flotilla was proceeding at approximately 1½ miles per hour, and could have been brought to a stop within 500 feet, according to Flanagin. When the Nita Dean was approximately one-half mile from the bridge, the pilot signaled the bridge tender by one long blast of the horn, which was the proper signal in accordance with Federal Regulations of River Traffic to give notice for the opening of the draw bridge.

The return signal received from the bridge tender was a flashing green light, which the witness Flanagin stated remained on to the best of his knowledge until one of the barges had passed under the bridge. He saw

nothing on or about the bridge, which gave an indication of trouble.

When the Nita Dean was approximately 250 feet away, the bridge raised approximately two feet, then stopped, and a red flashing signal light was given therefrom. Flanagin then immediately reversed his engines, and the boat came to a halt immediately after the radar antenna had struck the front edge of the bridge, as the bow of the Nita Dean passed under it. The bridge then opened.

The radar antenna, according to the witness Flanagin, after striking the bridge, fell to the deck, and the shaft to which the radar screen was attached was bent, and would no longer revolve. He stated that this equipment was in good working condition prior to the accident. After the collision, he resumed the course downstream towards his destination, and had no conversation with respondent's employee.

Respondent's witness, Harold Johnson, had been a bridge tender for a period of two months at the time of the accident. He stated that the Nita Dean was approximately one-quarter mile up stream when the horn signal was given, and that he replied by a green flasher light signal of five seconds duration. He then waited approximately thirty seconds before initiating the bridge raising procedure until he observed a break in the vehicular traffic.

This procedure involved ten separate steps, the first of which, after switching on the power, was to halt the traffic by lowering successively four gates, one for each traffic lane at each end of the bridge.

The first gate he attempted to lower was the one controlling eastbound traffic. At this time there was no

traffic on the bridge, and the approaching vehicles had stopped at each end thereof. This gate could not be completely lowered, according to the witness, because an automobile had stopped directly under it. The bridge raising mechanism was such that it would not operate until all of the traffic control gates were lowered.

Thereupon, Johnson took a megaphone and shouted from the control house to attract the attention of the motorist, and direct him to come across the bridge. He had to shout several times before the motorist finally started across. This consumed approximately one minute. After the motorist proceeded partially across the bridge, he, Johnson, turned on the red flasher signal. It required approximately thirty seconds for the motorist to complete the crossing.

At this time the Nita Dean, according to Johnson, was 600 to 700 feet from the bridge. After the motorist had completed his crossing, the witness resumed the bridge raising procedure, which required an additional one minute.

He stated that he watched the Nita Dean, as it approached the bridge, but acknowledged he did not watch it at the times he was engaged in performing the procedure required in raising it.

He further stated that, from his position, he could not see the Nita Dean after it went under the bridge. He heard no unusual noise, and did not see whether any damage was done to the Nita Dean. After it passed through the bridge, he lowered it.

These two witnesses are in conflict with respect to distances and time. It is apparent that either one or both of them are mistaken on these estimates. However, the precise distances of the Nita Dean from the bridge

at various times is not controlling. It is for us to determine from all of the evidence, and the natural and reasonable inferences to be drawn therefrom, the facts as to first, whether or not the Nita Dean actually struck the bridge, and second, the manner in which the collision, if any, occurred.

With respect to the first question, the witness Flanagin, testified unequivocally that the radar antenna of the Nita Dean collided with the bridge. There was no witness offered by respondent, who expressly contradicted this testimony. Johnson, the bridge tender, stated that he did not see whether any damage was done to the Nita Dean. His testimony to the effect that he heard no collision does not bear greatly on the question, since he acknowledged that there was comsiderable noise around the bridgehouse. Nor, does the fact that he observed no damage to the bridge constitute evidence that no collision occured. He did not state that he inspected the bridge, nor does it appear that the particular collision would damage it.

His acknowledgment that he did not watch the Nita Dean, while operating the bridge, is a plausible reason why he observed no collision.

In order for us to come to the conclusion that no collision occurred, we would, of necessity, be compelled to disregard the sworn testimony of the witness Flanagin, and accord to it no weight whatever. Testimony on this point is not similar to an expression of an opinion on time and distance where a witness might be and often is mistaken. Here the collision either happened, or did not happen. This witness stated that it did, and there is nothing in the record, which causes us to doubt his veracity.

Moreover, George A. Freeman, Jr., Sales and Service Manager for the Radiomarine Corporation of America, New Orleans, Louisiana, and Lester E. Trubey, a radio technician of that company, both testified to repairing the damaged antenna. Also, claimant's exhibit No. 1, a subrogation receipt from the Westchester Fire Insurance Company in the amount of $875.29, sets forth the fact that the damage resulted from a collision between the Nita Dean and the Ruby Street Bridge on November 24, 1953.

We find, therefore, that the collision did occur.

As to the second question, namely, the manner in which the collision happened, we find the facts to be: The Nita Dean properly signaled its approach when between a quarter and a half mile from the bridge. The exact distance is not of paramount importance. The return signal from the bridge tender was a green flashing light given for a period of time in accordance with the then existing regulations. The Nita Dean continued toward the bridge at a slow rate of speed approximately 1½ miles per hour. No other signal was given until the Nita Dean was too close to avoid the collision. The bridge was clear of traffic, and nothing was apparent to cause the pilot to believe that it would not open in sufficient time. When the Nita Dean was approximately 250 feet from the bridge, the red flasher light came on, and the pilot immediately reversed his engines, and thereafter did all that could have been reasonably expected of him in attempting to stop.

Respondent's witness, Johnson, places the **Nita** Dean 600 to 700 feet from the bridge at the time he gave the red flasher signal. We believe he was mistaken in his estimate of distance. If this were so, not only would

the Nita Dean have been able to stop, but the bridge would have been opened before the Nita Dean reached it, and no collision would have occurred.

The bridge tender, after hearing the Nita Dean signal when a quarter to a half mile from the bridge, began to take the necessary steps to raise it. He encountered difficulty through no fault of his own, because an automobile, stopped under the gate, prevented his opening the bridge until the automobile had crossed it. Up to that point, he had acted properly.

He then, however, before giving the red flasher signal to the Nita Dean, expended approximately one minute shouting at the driver of the automobile to attract his attention and instruct him to go across the bridge, when the Nita Dean was approaching in close proximity.

Here is the point upon which this case should turn. Was it negligence on the part of the bridge tender to delay giving a red flasher signal until he had finally attracted the attention of the automobile driver? Should he have given the signal as soon as he observed the automobile stopped under the gate? Was the pilot of the Nita Dean entitled to rely upon the bridge opening in the absence of a specific signal to the contrary?

We have noted the authorities cited by both claimants and respondent, and the regulations and directives issued by the Corps of Engineers, U. S. Army, regarding signals to be given by vessels and bridge tenders in the Joliet area.

The general principle of law regarding the use of navigable streams by owners and operators of vessels and bridges is set forth in *Clement vs. Metropolitan Westside El Ry. Co.*, 123 Fed. 271 at page 273, which was cited and followed by this Court in the case of

*Fabick Tugboat Rental Co., Inc., A Corporation,* vs.
*State of Illinois,* 21 C.C.R. 360, and in a number of cases
throughout the country.

"A bridge spanning a navigable river is an obstruction to navigation
tolerated because of necessity and convenience to commerce upon land. Such
a structure must be so maintained and operated that navigation may not be
impeded more than is absolutely necessary, the right of navigation being
paramount. It is incumbent upon the owner that the bridge be so constructed
that it may be readily opened to admit the passage of craft, and maintained
in suitable condition thereto. It is also his duty to place in charge those who
are competent to operate the bridge, to watch for signals, and to open the
bridge for the passage of vessels, and for the performance of such delegated
duty he is responsible. It is also his duty to equip the bridge with proper lights
giving warning of the position of the bridge and of its opening and closing. If
for any reason the bridge cannot be opened, proper signals should be given to
that effect, such as will warn the approaching vessel in time to heave to. A
vessel, having given the proper signal to open the bridge and prudently pro-
ceeding under slow speed has, in the absence of proper warning, the right to
assume that the bridge will be timely opened for passage. She is not bound to
heave to until the bridge has been swung or raised and locked, and to
critically examine the situation before proceeding (*City of Chicago* vs. *Mullen,*
54 C.C.A. 94, 116 Fed. 292), but may carefully proceed at slow speed upon
the assumption that the bridge will open in response to the signal, and may
so proceed until such time as it appears by proper warning, or in reasonable
view of the situation, that the bridge will not be opened (*Manistee Lumber
Company* vs. *City of Chicago* (D.C.), 44 Fed. 87; *Central Railroad Com-
pany of New Jersey* vs. *Pennsylvania Railroad Company,* 8 C.C.A. 86, 59
Fed. 192), when it becomes the duty of the vessel, if possible, to stop, and,
if necessary, to go astern."

These principles are also set forth in Vol. 45 of
*Corpus Juris* in the chapter on Navigable Waters. With
particular reference to the duty of a navigator, it reads
as follows at paragraph 80BB:

"Navigators are only required to use ordinary skill and care in attempting
to pass through a draw. A vessel having signaled for the opening of a draw
may properly proceed at slow speed on the assumption that the draw will
open until the contrary appears by proper warning or otherwise, and is not
to be held contributorily negligent, because of acts performed in the emer-
gency created by the negligent management of the draw, even though the
navigators may not have pursued the wisest course under the circumstances;
but, on the other hand, the navigator must exercise due care, and the pilot
of a vessel may not speculate on the hazards incident to a failure to open a
draw, and continue to advance toward an unopened draw contrary to the

demands of prudence, or where a harbor regulation requires that the vessel be checked unless a return signal from the bridge is received, and it is negligence for a vessel to proceed after receiving a signal given in time and for good cause that the bridge is not open."

Therefore, unless changed by statute or regulation with the force of a statute, the pilot of the Nita Dean, after he signaled and received the acknowledgment, had the right to presume that the bridge would open in sufficient time to permit safe passage, and such presumption continued to exist until the red flasher signal was given from the bridge. Respondent's bridge tender owed an affirmative duty to immediately signal the Nita Dean, as soon as it reasonably appeared that the bridge could not be opened without delay.

Respondent contends, however, that, by virtue of the regulations and directives issued by the U. S. Corps of Engineers, a pilot can no longer presume that the bridge will be opened barring any affirmative warning or reasonably apparent condition to the contrary. He must stop, if necessary, and await an affirmative signal that the bridge is being opened before he is entitled to proceed.

We do not agree with this construction.

The regulations were introduced into evidence as respondent's exhibits Nos. 1 and 2, the pertinent parts of which read as follows:

Respondent's exhibit No. 1—

"Upon receipt of signal from an approaching vessel, the bridge tender will answer by turning on the alternating green flashing lights for a short interval of about 5 seconds. As soon as highway traffic is stopped, and the bridge starts to open, the alternating green flashing lights will again be turned on, and will remain on until the vessel has cleared the bridge.

If the draw cannot be opened immediately, or if open, must be closed immediately, the signal from an approaching vessel will be acknowledged with the alternating red flashing lights.

The operation of the regular pier lights and center navigation lights of each bridge will not be changed.

All vessel Masters are urged to cooperate with the bridge tenders and expedite the movement of their craft through bridge draws as promptly as practicable."

Respondent's exhibit No. 2—

"Upon signal from an approaching vessel, the bridge tender shall answer the signal by turning on the flashing green lights for a short interval, three to five seconds, then turn off. This will let the pilot know that his signal has been heard, and that the bridge tender is ready to open the bridge.

Just as soon as traffic has been stopped, and the bridge starts to open, the green flashers will again be turned on, and left on until the vessel has cleared the bridge.

The red flashing signals are to be used only as a signal that the bridge cannot be opened immediately due to a number of reasons, or, in any emergency, where it would be hazardous for a vessel to proceed toward the bridge unless under positive control."

Neither exhibit contains a specific direction requiring a vessel to stop until the second green signal is given.

If it was the practice to require the vessel to stop and await the raising of the bridge before approaching it, this green signal would be unnecessary during daylight hours of good visibility, since it would be obvious to anyone that the bridge was opening. It appears to us that this signal's purpose is mainly designed to give notice when visibility is bad or limited, and as a signal to approaching vessels during periods of good visibility that speed may be increased in order to facilitate passage with the least possible delay.

The use of the red flasher light is not restricted by the directives to the initial reply upon receipt of the approaching vessel's signal.

If such a narrow construction was announced and given effect, it would render the signal useless for the most part, since the real emergencies, wherein danger is threatened, arise when a vessel comes into close proximity of a bridge, and not when one quarter to a half mile away. The contents of exhibit No. 2 provide for its use in all emergencies:

"The red flashing signals are to be used only as a signal that the bridge canont be opened immediately due to a number of reasons, or, in any emergency, where it would be hazardous for a vessel to proceed toward the bridge unless under positive control."

We believe that these directives fit into the framework of the law heretofore announced on this question, and do not alter it in any respect.

Consequently, we find that the pilot of the Nita Dean was in the exercise of ordinary care in proceeding toward the bridge, at a slow speed, after receiving the acknowledging green flasher light signal from the bridge. We further find that he exercised ordinary care in attempting to bring his vessel to a halt upon receiving the red flashing signal. The claimants, therefore, have borne the burden of proving that they were in the exercise of ordinary care for the safety of the Nita Dean at the time and immediately prior to the collision in question.

We further find that the bridge tender was negligent in failing to immediately give the red flashing signal, as soon as he observed the automobile under the gate, which prevented an immediate opening of the bridge. It was his delay in giving this warning signal that proximately caused the collision in question. Had he given the signal, the Nita Dean would have been able to completely stop before reaching the bridge. He should have foreseen this situation, and acted accordingly. The facts, as we have found them to be from the record presented to us, establish the necessary elements to the allowance of the claim.

With respect to the damages, we find that the repairs in the amount of $1,375.29, established by the testimony of the witness Freeman and the witness Trubey, are fair and reasonable charges for repairing the damage done in the collision. We also find from the evidence that

claimant, Westchester Fire Insurance Company, paid to the owners of the Delta Towing Company the sum of $875.29 under the terms of a $500.00 deductible policy of insurance, and that the owners of the Delta Towing Company paid the balance due on the bill, which amounted to $500.00.

We, therefore, allow the claim of the Westchester Fire Insurance Company in the amount of $875.29, and the claim of J. E. Vickers and F. N. Byrd, Co-Partners d/b/a Delta Towing Company, in the amount of $500.00.