ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, a Corporation, Libelant,

v.

The MOTOR VESSEL D. MARK, Respondent.

RADCLIFF MATERIALS, INC., a Corporation, as owner of the BARGE ADDSCO 556, Libelant,

v.

The M/V D. MARK, and against T & H Towing Co., Inc., a Corporation, as owner of the M/V D. Mark, and against the St. Louis-San Francisco Railway Company, a Corporation, Respondents.

T & H TOWING COMPANY, Inc., a Corporation, as owner of the M/V D. Mark, Libelant,

v.

ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, a Corporation, Respondent.

Nos. 3060, 3073, 3108.

United States District Court S. D. Alabama, S. D.

July 28, 1965.

T. K. Jackson, Jr., Armbrecht, Jackson, McConnell & DeMouy, Mobile, Ala., for St. Louis S.F. Ry. Co.

J. Manson Murray, Vickers, Riis, Murray & Curran, Mobile, Ala., for Radcliff Materials, Inc.

George F. Wood, Pillans, Reams, Tappan, Wood & Roberts, Mobile, Ala., for Motor Vessel D Mark and T. & H. Towing Co., Inc.

DANIEL HOLCOMBE THOMAS, District Judge.

These consolidated cases arise out of the striking of a rai'road bridge by a barge on the Alabama River. Admiralty No. 3060 is a suit by the owner of the bridge, St. Louis-San Francisco Railway Company, against the motor vessel, D Mark, for damages to the bridge. Admiralty No. 3073 is a suit by the owner of the striking barge, Radcliff Materials, Inc., against the vessel, D Mark, its owner, T & H Towing Company, and the St. Louis-San Francisco Railway Company, for damages to the barge. Admir-

alty No. 3108 is a suit by the owner of the vessel, T & H Towing Company, against the owner of the bridge, St. Louis-San Francisco Railway Company, for damages to the vessel.

## FINDINGS OF FACT

1. The St. Louis-San Francisco Railway Company is a Missouri corporation that operates within the jurisdiction of this Court, and it owns, maintains, and operates a swing-type drawbridge at 117.-8 mile post over the Alabama River near the community of Shepard, Wilcox County, Alabama. T & H Towing Company, an Alabama corporation, owns and operates the motor vessel, D Mark. Radcliff Materials, Inc., an Alabama corporation, is the owner of the steel barge ADDSCO 556.

2. The motor vessel, D Mark, was completed in January 1964. The trip in question occurred on January 24 and 25, 1964. The tug, D Mark, left Mobile heading for Camden on January 24, 1964, to pick up two barges loaded with gravel. The tug passed under the bridge in question at 117.8 mile post some time between 6:10 a. m. and noon on the 24th, heading north. The relief captain of the tug, Captain Walter Patronas, yelled up to the bridge tender, "We'll be back down."

3. The tug left Camden, 156 mile post, at 5:15 p. m., on January 24, 1964, headed south to Mobile with two 240′ x 50′ barges loaded with gravel. The barges were made up into a unit tow, stern to stern, with the tug pushing. Captain Danny Taylor was at the helm from 5:15 p. m. till midnight. The captains usually worked in six-hour shifts. Captain Patronas came up to the wheel house at Black Bluff Bar, 124 mile post, at 11:15 p. m. After getting his eyes adjusted to the dark, Captain Patronas relieved Captain Taylor at Tait's Bar, 122 mile post, at midnight.

4. While Captain Taylor was on duty, the flotilla tied up at Reeves Bar, 128 mile post, because of bad weather. The testimony shows no other trouble on the trip until the vessel reached McNeils Bar, 119 mile post. The distance from Camden, 156 mile post, to the bridge, 117.8 mile post is forty miles.

5. When Captain Patronas reached Wilcox Bar, 120 mile post, he reduced speed and started sounding the four prong air horn to apprise the bridge tender of their pending arrival. The horn gave three long blasts every two to four minutes. The sound of the horn could be heard from two to three miles. The searchlight was also swept across the trees to give the bridge tender notice that the tow was approaching the bridge.

6. When the tug rounded the bend at McNeils Bar, 119 mile post, the captain saw that the bridge had not been opened. The bridge was unlighted and no sound signal was given. Upon seeing this, the tug immediately started backing maneuvers. McNeils Bar is one-half mile from the bridge. The direction of the current was south bound with a speed of four to five miles per hour. The current caused the tug and barges to sway from bank to bank. Captain J. E. Woolsey, an observer on the tug, testified that the tug struck the east bank while backing. The tug was equipped with three forward rudders on the aft end of the tug and two backing rudders on the forward end of the tug. Captain Patronas concluded that the tug lost its side forward rudders while backing. He stated that he could not have steered the tug from Tait's Bar to McNeils Bar with one forward rudder. The river at McNeils Bar was 350 to 400 feet wide from shore to shore. While backing, the tug employed all engines at full speed.

7. The testimony establishes the fact that the tug was required to back for from twenty to fifty-five minutes before the bridge was opened. When the bridge was finally opened, the tug started down stream and Captain Patronas realized that he could not control the tow. He immediately started backing procedures, but the bow of the front barge, ADDSCO 556, hit the center pier of the bridge. The bridge has one-hundred feet clearance on each side of the center pier. The striking occurred at 1:15 a. m., on January 25, 1964. After striking the bridge,

the tow proceeded on through. The captain finally stopped and tied up the tow at 115 mile post. The tug was inspected at this time and only the center forward rudder remained. The other two were gone.

8. The bridge tender, Mr. William Browning, testified that he did not hear any sound signal. The first he knew about the tow was when he saw a beam of light on the bridge. Upon seeing the light, he immediately commenced the operation of opening the bridge. It took fifteen minutes to open the bridge that night, according to Mr. Browning.

9. All the witnesses testified that Captain Patronas followed the correct procedure in handling the tow as he did under the adverse circumstances. The tow could not be turned around safely at McNeils Bar; neither could it have been safely grounded. All the witnesses also stated that had the bridge been open, the flotilla could have easily gone through the bridge.

10. Captains Patronas, Woolsey, and Taylor testified that it was safe to handle those two barges with the D Mark that night. Captain Taylor has handled two barges, one 240' x 50' and one 190' x 35', on the same water, and two similar barges, 240' x 50', on other waters with the D Mark without trouble.

11. The trip in question was the first time a tow so large was ever tried. Each barge was loaded with approximately 2,-800 tons of gravel. Captain Woolsey was sent on the trip as an observer to determine if this size tow was safe and feasible.

12. The testimony establishes that the tow was too heavy for the tug on the river in question. As a consequence of this, the tug was negligent in this operation leading to the accident.

13. The testimony further shows that the negligence of the tug was considerably greater than that of the bridge. However, the negligence of both caused the damages to the barge.

14. The parties stipulate that the damages to the barge were $9,838.74; and to the bridge and the tug, $1,600 each. The court so finds.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction in this matter under Title 28 U.S.C. § 1333.

2. As a general rule, when a moving vessel collides with a fixed object, there is a presumption that the moving vessel is negligent. Wilmington Ry. Bridge Co. v. Franco-Ottoman Shipping Co., 4 Cir., 259 F. 166. However, when both sides have fully presented testimony regarding their version as to what happened prior to the collision, the presumption disappears as a rule of law. Pennsylvania Railroad Company v. S.S. Marie Leonhardt, 3 Cir., 320 F.2d 262.

3. Title 33 U.S.C. § 494, sets out the duties of a bridge owner:

"* * * The persons owning or operating any such bridge shall maintain, at their own expense, such lights and other signals thereon as the Commandant of the Coast Guard shall prescribe. If the bridge shall be constructed with a draw, then the draw shall be opened promptly by the persons owning or operating such bridge upon reasonable signal for the passage of boats and other water craft. * * *"

4. The case of Clement v. Metropolitan West Side El. Ry. Co., 7 Cir., 123 F. 271, states the law applicable to bridges across a navigable stream:

"* * * A bridge spanning a navigable river is an obstruction to navigation tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary, the right of navigation being paramount. It is incumbent upon the owner that the bridge be so constructed that it may be readily opened to admit the passage of craft, and maintained in suitable condition thereto. It is also his duty to place in charge those who are competent to operate the bridge,

to watch for signals, and to open the bridge for the passage of vessels, and for the performance of such delegated duty he is responsible. It is also his duty to equip the bridge with proper lights giving warning of the position of the bridge and of its opening and closing. If for any reason the bridge cannot be opened, proper signals should be given to that effect, such as will warn the approaching vessel in time to heave to. A vessel, having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage. She is not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding (City of Chicago v. Mullen, 54 C.C.A. 94, 116 Fed. 292), but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened (Manistee Lumber Company v. City of Chicago [D.C.] 44 Fed. 87; Central Railroad Company of New Jersey v. Pennsylvania Railroad Company, 8 C.C.A. 86, 59 Fed. 192), when it becomes the duty of the vessel, if possible, to stop, and, if necessary, to go astern."

The Clement case, supra, was cited as the controlling law in the cases of Munroe v. City of Chicago, 7 Cir., 194 F. 936, and N. M. Paterson & Sons, Limited, v. City of Chicago, 7 Cir., 324 F.2d 254.

5. The Court finds that the failure to promptly open the bridge was a cause of the accident.

6. The Court further finds that the negligence of the tug was also a cause of the accident.

7. The "mutual fault" or "joint fault" of both the bridge and the tug caused the damage to the barge.

8. The Court would prefer to apply the comparative negligence doctrine in this case, but for the reasons stated in In Re Adams' Petition, 2 Cir., 237 F.2d 884, is compelled to follow the general rule of equal division of property damages:

"* * * We have frequently called attention to the inherent injustice of this rule. [Cases cited.] But the rule of equal division of property damage is so well established in this country that it would create intolerable confusion were a court of intermediate jurisdiction such as ours to deviate from it. We shall therefore continue to apply the rule until there shall be authoritative sanction for departure therefrom."

On this same subject, the court in N. M. Paterson & Sons, Limited, v. City of Chicago, 7 Cir., 324 F.2d 254, said:

"The claimed shortcomings of the rule are features inherent in it and have always coexisted with it. We are aware of no change in the nature or circumstances of the subject matter of its application which would justify its judicial rejection, or its restriction to mutual but equal fault cases, on the basis that it no longer serves to accomplish its original purpose. In our opinion the substitution of any alternative rule is a matter for congressional rather than judicial determination."

9. Therefore, under this historic rule of equal division of damages when there are two parties at fault, the Court finds that the St. Louis-San Francisco Railway Company and T & H Towing Company must equally pay Radcliff Materials, Inc., for the damages to its barge.

10. The Court further finds that since the parties stipulate that the damages to the bridge and the tug are equal, neither St. Louis-San Francisco Railway Company nor T & H Towing Company is entitled to recover for its damages.

Decree to be entered accordingly.