PER CURIAM.

(No. 6013—Claimant )

FEDERAL BARGE LINES, INC., Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed July 26, 1973.*

LUCAS & MURPHY and MALCOLM D. DURR, Attorneys for Claimant.

WILLIAM J. SCOTT, Attorney General; WILLIAM E. WEBBER, Assistant Attorney General, for Respondent.

HOLDERMAN, J.

Federal Barge Lines, Inc. filed a claim against the State of Illinois alleging that on the 11th day of March, 1969, one of their barges was damaged at Joliet, Illinois.

On the day in question, the JOHN ALEXA, which was the vessel supplying the power for the moving of the eight barges and the tow, was bound upstream. When it left Brandon Road Piers in the area of Joliet, it became necessary to go under a series of bridges. Most of these bridges are lift bridges which have to be lifted to allow vessels of certain size to pass underneath.

In this particular tow, one of the barges, the same being barge T-2052, was empty; consequently, it was riding much higher in the water than the rest of the tow.

The tow, while passing under the Jefferson Street

bridge which is approximately 1,000-1,200 feet down-stream from the Cass Street bridge, blew one long blast on the whistle to warn the tender of the Cass Street bridge that they were coming and which signal is for the purpose of alerting the bridge tender.

It is the duty of the bridge tender when he has heard the long blast of the whistle to either signify that he cannot raise the bridge by turning on a red light, or if he can raise the bridge, to turn on a green light.

After the long whistle blast from the JOHN ALEXA was given, the bridge tender on the Cass Street bridge turned on a green light, which was the signal that the bridge tender had received the warning and that the bridge would be raised.

When the motor vessel and tow were approximately 500 feet from the Cass Street bridge, the bridge tender changed the green light to a red light.

The pilot immediately on seeing the change in the signal light, ordered both engines stopped and then put them at full astern in an effort to stop the tow and then back it up. He also piloted the tow so that the barge that was subsequently injured would be in midstream, this being where the bridge was highest and where it had the best possible chance of avoiding the accident which later occurred.

The momentum of the tow was too great to be stopped in the distance that remained after the receiving of the red light signal. The tow continued its forward momentum with the result that the covers of barge T-2052 hit the underside of the bridge, rolling the covers back, and causing the damage complained of.

After the incident, the pilot of the tow was informed by the bridge tender that the bridge had been involved in

an accident on the previous day and that he did not have sufficient power to get his west gates down.

The bridge is under the sole control of the respondent and there is not any evidence to the effect that the users of the waterway, including claimant, were informed of the condition of the bridge.

Claimant's Exhibit No. 1 was identified by the first witness to testify, George Leithner, an independent surveyor. This individual testified that it was his job to examine damages such as had been sustained in this accident and to estimate the approximate cost of repairs. He further testified that the low bid to repair the barge was from Material Service in the amount of $5,333.78, and that subsequently a contract was drawn up between Federal Barge Lines and Material Service for the repair work.

This witness also identified claimant's Exhibit No. 2, which was a service invoice from his firm in the amount of $123.00 which was paid by Federal Barge and covered the expense of the surveyor in determining the amount of damages to the barge.

The shipyards superintendent of Material Service testified concerning the repairs done to the barge, and stated the work started on the 12th of March, 1969 and was completed on the 4th of April, 1969. He also stated Exhibit No. 3 was the invoice for repairs to the barge.

Claimant's Exhibit No. 4 was a letter written to the Attorney General of the State of Illinois, signed by John J. Bennett, technical advisor of the Department of Transportation, stating that the charge of $101.00 per day for the use of the barge for a period of 22 days was reasonable and that the cost for repairing the barge was reasonable and not disputed by the department.

Claimant's Exhibit No. 5 was a copy of the rules and regulations dealing with situations such as are present in this case.

The respondent filed a motion for summary judgment, which was denied, and the case was assigned to a Commissioner for hearing.

The respondent did not offer any evidence, did not contest the amount of damage, and the bridge tender's testimony was not offered. He apparently was available but was not called by the respondent.

The respondent filed a brief in this cause contending that the claimant was guilty of contributory negligence in not having the barge under control and not being able to stop the same prior to the collision with the bridge.

It is apparent from the record in this case that the bridge tender of the Cass Street bridge was in a position that he not only should have seen the tow coming but also heard the signal not only for the Cass Street bridge but also for the Jefferson Street bridge, which was approximately 1,000-1,200 feet away. It would have been a very simple matter for him to have at that time tested the equipment on his bridge, and if found inoperative, to have given the red light in the first instance instead of the green light.

The green light is the signal to come ahead, which is exactly the procedure followed by the captain of the tow.

The Court has had occasion to pass upon similar situations. The Court calls attention to the case of *Fabick Tugboat Rental Co., Inc.* vs. *State of Illinois*, 21 CC Page 360. In that case, the claimant sustained damages as the result of a collision of the boat, NINA F, with the Jefferson Street bridge in Joliet. The captain of the tow gave

the proper signal and stopped his tow as it approached the Rock Island Railroad bridge, which is downstream from the Jefferson Street bridge. After the bridge was reopened, he signaled the Jefferson Street bridge to open but received no reply. The Captain went about half way between the two bridges, or some 600 feet south of the Jefferson Street bridge, and gave the proper signal again but received no return signal from the bridge tender. At that time, the Captain of the tow stated that he could see the bridge tender at his post and he signaled him with the lights but still received no return signal. He continued on toward the bridge and gave another signal when approximately 300 feet from the bridge, and then, upon still not receiving any signal, he have a distress signal, and immediately reversed his engine to full astern but he was unable to stop the NINA F, and a crash resulted, causing the damages complained of.

The Court, in passing upon those facts, stated:

"We are of the opinion that failing to raise the bridge when it had ample notice of the approach of the vessel, was a neglect of duty on the part of the respondent. The State of Illinois, acting by and through its agent, was guilty of negligence, which proximately caused the damages complained of by the claimant. In the case of *Clement* vs. *Metropolitan West Side EL. Ry. CO.*, 123 Fed. 271 (C.C.A. 7th Cir., 1903), which involves facts similar to those in the instant case, the Court said:

"A bridge spanning a navigable river is an obstruction to navigation tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary, the right of navigation being paramount. It is incumbent upon the owner that the bridge be so constructed that it may be readily opened to admit the passage of craft, and maintained in suitable condition thereto. It is also his duty to place in charge those who are competent to operate the bridge, to watch for signals, and to open the bridge for the passage of vessels, and for the performance of such delegated duty he is

responsible. It is also his duty to equip the bridge with proper lights giving warning of the position of the bridge and of its opening and closing. If for any reason the bridge cannot be opened, proper signals should be given to that effect such as will warn the approaching vessel in time to heave to. A vessel, having given the proper signal to open the bridge and prudently proceeding under slow speed has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage. She is not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding (*City of Chicago* vs. *Mullen*, 54 C.C.A. 94, 116 Fed. 292), but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened (*Mainistee Lumber Company* vs. *City of Chicago (D.C.)*, 44 Fed. 87; *Central Railroad Company of New Jersey* vs. *Pennsylvania Railroad Company*, 8 C.C.A. 86, 59 Fed. 192), when it become the duty of the vessel, if possible, to stop, and, if necessary, to go astern."

A similar situation presented to this Court was the case of *J. E. Vickers, et al* vs. *State of Illinois*, 22 C.C., Page 660.

The facts in this case are nearly identical with the case at bar. In that case, the NITA DEAN was proceeding upstream at Joliet and as it neared the Ruby Street bridge, it properly signaled its approach when it was between one-half and one-quarter mile from the bridge. The return signal from the bridge tender was a flashing green light given for a period of time in accordance with existing regulations. The NITA DEAN continued toward the bridge at the rate of approximately 1½ miles per hour. No other signal was given until the NITA DEAN was too close to avoid the collision. The bridge was clear of traffic, and nothing was apparent to cause the pilot to believe that it would not open in sufficient time. When the NITA DEAN was approximately 250 feet from the bridge, the red flasher came on, and the pilot immediately reversed his engines, and thereafter did all that could have been reasonably expected of him to stop.

This Court finds that it was the duty of the bridge tender in situations such as this to give proper signals to

the approaching vessels when the bridge will not open. These signals should be given the approaching vessels in sufficient time so that they can heave to, and once the pilot of a vessel has been given the proper signal to proceed, the vessel has the right to assume that the bridge will be opened for passage.

It is the opinion of this Court that the claimant was not guilty of contributory negligence and that the only negligence involved was that of the respondent by its failure to give the red light to the oncoming tow in sufficient time so that it could stop. This it failed to do and the damages complained of resulted.

Claimant's claim is hereby allowed in the amount of $7,678.78.