(No. 82-CC-2295

SPIVEY MARINE & HARBOR SERVICE CO., and CONTINENTAL INSURANCE CO., Claimants, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed June 23, 1994.*

GOLDSTEIN & PRICE (SIMON TONKIN, of counsel), for Claimant.

ROLAND W. BURRIS, Attorney General, for Respondent.

## OPINION

PATCHETT, J.

This is a tort claim which arises as a result of a towboat-drawbridge collision on the Des Plaines River in the vicinity of Joliet Harbor. This occurred on June 5, 1981, between 9:00 p.m. and 9:30 p.m. As the towboat, the Randy Spivey, approached the Jefferson Street drawbridge, the pilot signalled for the drawbridge to open. The evidence was contradictory as to whether the bridge had begun opening. The pilot of the Randy Spivey, Mr. Bolte, testified that he properly signalled for the bridge to open. He testified that after he saw no response to the first whistle, he blew another whistle and placed his spotlight on the bridge tender's station house. After the drawbridge still failed to respond, Mr. Bolte began to attempt to stop the tow. Mr. Bolte further testified that at no time did the drawbridge tender give the proper signal indicating that the bridge could not be raised.

The Randy Spivey was pushing two loaded coal barges and an empty petro-chemical barge. After it be-

came apparent that the bridge was not going to open in time, Mr. Bolte maneuvered the boat and tow so that the right front cover of the tow (the coal barges, which set lower in the water than the empty petroleum barge) would slip under the bridge. Mr. Bolte cited a concern as to the results of the gasoline barge striking the bridge. He feared fire or an explosion. In order to attempt to accomplish the maneuver described above, Mr. Bolte was forced to swing the rear of his boat toward the left descending seawall and the front of the tow towards the right descending seawall. In other words, the boat and tow moved in a counter-clockwise motion.

The plan did not quite work. The front starboard corner of the lead coal barge made contact with one of the bridge piers. This contact caused the cable securing the gasoline barge to break, setting the barge adrift.

The real damage with which we are concerned, however, occurred when the towboat continued toward the left descending seawall. Mr. Bolte found his boat fast approaching a private yacht, the Seaghost, which was moored approximately 400 to 450 feet below the Jefferson Street Bridge near the left descending seawall. Mr. Bolte testified that he tried several different maneuvers to avoid hitting the yacht, but they all failed. The towboat struck the yacht, causing it to sink.

At the trial of this cause before a commissioner of this Court, the Respondent was precluded by the commissioner from presenting evidence as to the yacht owner's negligence in the mooring of his yacht. The commissioner's reasoning for this was that the Respondent did not raise the issue as an affirmative defense as required by section 2—613(d) of the Illinois Code of Civil Procedure. 735 ILCS 5/2—613(d).

There was evidence, however, as to the possible negligence of Mr. Bolte, the pilot of the Randy Spivey. Mr. Bolte shined his spotlight on the bridge tender's house, possibly causing at least some of the delay in opening the bridge. It appears likely that the bridge was approximately 30 degrees open when the barge struck it.

In addition, Mr. Bolte's own testimony was that upon realizing that the bridge was not opening quickly enough, he traveled an additional 200 to 400 feet before "backing hard" on his engine. If he had not delayed so long, it is possible that there would have been no accident at all. In addition, there was some evidence that the Randy Spivey hit the Seaghost twice. The second hit occurred as the Randy Spivey attempted to maneuver away from the bridge.

This claim presents a varied and interesting set of legal issues. The first and overriding issue is whether maritime law applies to this claim. The Court of Claims has decided a series of bridge/tugboat collision cases. In *Fabick Tugboat Rental Company v. State* (1952), 21 Ill. Ct. Cl. 360, this Court awarded damages in favor of the tugboat company as a result of a collision with the drawbridge. That case cited with approval the case of *Clement v. Metropolitan West Side Elevated Railway Co.* (7th Cir. 1903), 123 F. 271. There the seventh circuit stated:

"A bridge spanning a navigable river is an obstruction to navigation tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary, the right of navigation being paramount. It is incumbent upon the owner that the bridge be so constructed that it may be readily opened to admit the passage of craft, and maintained in suitable condition thereto. It is also his duty to place in charge those who are competent to operate the bridge, to watch for signals, and to open the bridge for the passage of vessels, and for the performance of such delegated duty he is responsible. It is also his duty to equip the bridge with proper lights giving warning of the position of the bridge and of its opening and closing. If for any reason the bridge cannot be opened, proper signals should be given to that effect, such as will warn the approaching vessel in

time to heave to. A vessel, having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage. She is not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding (*City of Chicago v. Mullen*, 54 C.C.A. 94, 116 Fed. 292), but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened (*Manistee Lumber Company v. City of Chicago* [D.C.] 44 Fed. 87; *Central Railroad Company of New Jersey v. Pennsylvania Railroad Company*, 8 C.C.A. 86, 59 Fed. 192), when it becomes the duty of the vessel, if possible, to stop, and, if necessary, to go astern." *Clement*, 123 F. 271 and 273.

In 1958, in *Vickers v. State* (1958), 22 Ill. Ct. Cl. 659, this Court again awarded damages for a similar collision. The Court there held that the State was negligent for not raising the bridge, and also for failure to warn that the bridge would not open. There again the Court cited with approval the case of *Clement v. Metropolitan West Side Elevated Railway Co.*, as well as the quote cited above. There the Court found the State liable for a failure to raise the bridge in time and the failure to give the required warnings that the bridge was not going to be raised. The Court cited certain regulations and directives issued by the U.S. Corps of Engineers regarding signals to be given by bridge tenders. Those same signals, in somewhat amended form, were still valid at the time of the accident in question. In 1973, this court also awarded damages for the failure to raise a bridge in *Federal Barge Lines, Inc. v. State* (1973), 29 Ill. Ct. Cl. 25. Once again, the court cited with approval *Clement v. Metropolitan West Side Elevated Railway Co.*, cited above.

While this court has traditionally found liability on the part of the Respondent for failure to raise the bridge in time, it has never addressed the issue of whether these cases fell specifically under maritime law or under State law. Either the issue was not raised, or it was not necessary to reach a decision in the prior cases.

It is clear that certain Federal statutes govern the operation of drawbridges. Title 33 U.S.C. §499 provides that:

"The owner of or the agency controlling a drawbridge crossing navigable waters of the United States shall provide the appliances and the personnel necessary for the safe, prompt, and efficient operation of the draw." 33 C.F.R. §117.555(a).

In addition, Title 33 U.S.C. §494 provides that:

"The draw shall be opened *promptly* when the signal prescribed in Paragraph (d) of this section for the opening of the draw is received from an approaching vessel ° ° °." (33 C.F.R. §117.555(d).) (Emphasis added.)

Obviously these statutes directly control the facts of the situation we are faced with. The statutes by themselves, and the associated rules promulgated for their implementation do not, however, automatically control the issue of whether admiralty law applies in this case.

The law regarding admiralty jurisdiction was dramatically altered by the United States Supreme Court in *Executive Jet Aviation, Inc. v. City of Cleveland* (1972), 409 U.S. 249, 44 L. Ed. 2d 454, 93 S. Ct. 493. Prior to this case, admiralty law jurisdiction was based on a fairly strict locality test. The district court set forth the test, primarily relying on *Chapman v. City of Grosse Pointe Farms* (6th Cir. 1967), 385 F.2d 962. The district court set forth the test as: (1) the locality where the alleged tortious wrong occurred must have been on navigable waters, and (2) there must have been a relationship between the wrong and some maritime service, navigation, or commerce on navigable waters.

Based on that test, the circuit court of the sixth circuit affirmed a district court decision denying admiralty jurisdiction of a case which arose because of an aircraft crash into Lake Erie. It was appealed to the U.S. Supreme Court, which affirmed the decision. In doing so, the

Supreme Court set forth a new test for admiralty jurisdiction. They said that serious difficulties often occur with the locality test, which were illustrated by cases where the maritime locality of the tort was clear, but the invocation of admiralty jurisdiction was almost absurd. There the court gave examples such as a swimmer at a public beach injured by another swimmer or a submerged object on the bottom. Some courts have held admiralty jurisdiction in such cases, while other circuits declined to find admiralty jurisdiction. The courts stated that despite the broad language of cases like *The Plymouth* (1866), 70 U.S. (3 Wall), 20, 18 L. Ed. 125, the Supreme Court had never explicitly held that a maritime locality was the sole test of admiralty court jurisdiction. Indeed the Court pointed out that Congress had extended admiralty jurisdiction predicated on the relation of the wrong to maritime activities, regardless of the locality of the tort via the *Extension of Admiralty Jurisdiction Act*, 62 Stat. 496, 46 U.S.C.§740, enacted in 1948. That act was passed specifically to overrule cases such as *The Plymouth, supra*, which had held that admiralty does not provide a remedy for damage done to land structures by ships on navigable waters.

Although the specific holding of *Executive Jet Aviation, Inc.*, applied only to aviation, the Court clearly held that they would no longer invoke admiralty jurisdiction because of the mere fact that the alleged wrong occurred, or is located on or over, navigable waters. The Court did signal that they would require the wrong to bear a significant relationship to traditional maritime activity.

Subsequent to the Supreme Court's decision, several circuit courts had occasion to rule on or consider admiralty jurisdiction in somewhat less than normal circumstances. In *Kelly v. Smith* (5th Cir. 1973), 485 F.2d 520,

the court held that maritime jurisdiction would be invoked where a river pilot was injured by rifle fire directed at his vessel from an island in the Mississippi River which was being used for deer hunting. There the court said that circumstances to be considered are functions and roles of parties, types of vehicles and instrumentalities involved, causation and type of injury, and traditional concepts of the role of admiralty law. In *Gypsum Carrier, Inc., v. Union Camp Corp.* (5th Cir. 1974), 489 F.2d 152, the Fifth Circuit invoked admiralty jurisdiction when a vessel collided with a railroad bridge because smoke emitted from a paper mill nearby obstructed vision.

These and similar cases clearly establish that admiralty law should apply to this claim. We so hold. See also *The Pennsylvania Railroad Company v. SS Marie Leonhardt* (E.D. Pa. 1962), 202 F. Supp. 368; *N.M. Paterson & Sons, Limited v. City of Chicago* (7th Cir. 1963), 324 F.2d 254; *Chicago & Western Indiana Railroad Co. v. Motorship Buko Maru* (7th Cir. 1974), 505 F.2d 579; *St. Louis-San Francisco Railway Co. v. Motor Vessel D. Mark* (S.D. Ala. 1965), 243 F. Supp. 689.

Deciding that admiralty law applies to this claim does not complete the analysis of all the pending issues, however. Even if maritime law applies to cases involving vessel drawbridge collisions, it does not automatically apply in a court such as the Court of Claims. Obviously the Claimants in this case could have sued anybody but the State in Federal or State court on a maritime claim. Because the State has immunity, abrogated only by the Court of Claims system, they must bring their claim in this forum. Federal courts have held in *Continental Casualty Co. v. Canadian Universal Insurance Co.* (5th Cir. 1979), 605 F.2d 1340, that a maritime issue could be raised in a diversity suit, or brought in State court. The

court, however, held that while jurisdiction to decide litigation may be concurrent with State courts, or could be used to invoke Federal court jurisdiction on some independent basis, maritime law determines the rights of the parties involved.

In *Austin v. Unarco Industries, Inc.* (1st Cir. 1983), 705 F.2d 1), the court held that once admiralty jurisdiction is established, all of the substantive rules and precepts peculiar to the law of the sea become applicable. This is true even when the plaintiff decides to pursue his claim in the civil side of Federal or State court. The court went on to hold that while State law may supplement admiralty law, it may not flatly contradict it. State laws are generally referred to only when it affords greater protection to maritime employees than provided by admiralty law. The court reached a similar conclusion in *Taylor v. Lloyds Underwriters of London* (5th Cir. 1992), 972 F.2d 666 in which they held that the interpretation of a contract of marine insurance, in the absence of specific and controlling Federal rule, can be determined by reference to appropriate State law. Here the court cited with approval *Wilburn Boat Co. v. Fireman's Fund Ins. Co.* (1955), 348 U.S. 310, 99 L. Ed. 337, 75 S. Ct. 368.

For the reasons cited in these cases, we believe that if we are going to have a claim system abrogating State immunity, and if we are going to decide tort cases involving admiralty law, that this court must be guided by traditional concepts and rules of maritime law.

In applying these rulings to the facts of the present case, we first come to the issue of comparative negligence. The commissioner of this Court refused to allow the Respondent to present evidence of the possible negligence of the yacht owner because they had not pled it as an affirmative defense. Since we have previously ruled

that maritime law applies to this case, and not State tort laws, the specifics of the Code of Civil Procedure, sec. 2—613(d), would not apply. In *N.M. Paterson & Sons, Limited v. City of Chicago* (7th Cir. 1963), 354 F.2d 254, the seventh circuit court of appeals held that the district court erred in invoking the doctrine of comparative negligence in an admiralty action involving a collision between a steamer and a bridge. The court held that the equal-division rule should have been applied. That rule provides that even if the ship contributed two-thirds of the total fault, as opposed to one-third on the part of the City, the co-defendants would have to divide the damages. This was not brought before this Court at any time during the trial or briefing of this case. The equal-division rule basically provides that the parties divide the damages equally even though one is more at fault than the other. If this rule had been invoked in the present claim, it would have meant that the State of Illinois, and the barge operator, would have to divide the damages to the owner of the yacht, regardless of their respective degrees of fault. This rule, however, would have come into direct conflict with the rule of the Court of Claims which requires that a claimant exhaust all his remedies prior to coming to the Court of Claims.

In this case, the owner of the yacht, Joseph Jura, in fact sued the barge company in Federal court, and he filed a claim in the Court of Claims. After reaching a settlement with the barge company in Federal court, he assigned his claim against the State to the barge company. His claim against the State had been placed on general continuance in conformity with the Illinois Court of Claims Rules while he pursued his Federal lawsuit. Therefore, the issue is whether we should apply the equal-division rule to this claim, thereby splitting the damages of the yacht owner between the barge operator and the State of Illinois, or

whether we should decline to apply that rule because the Claimant was required to exhaust his remedies.

Before we decide that issue, let us again address the facts of this case. In *The Pennsylvania Railroad Co. v. SS Marie Leonhardt* (E.D. Pa. 1962), 202 F. Supp. 368, the United States District Court for the eastern division of Pennsylvania found that a ship having sounded the proper signal may proceed on approaching a drawbridge on the assumption that the bridge will be timely opened. The ship is under no duty to heave to and critically examine the situation to satisfy itself that the drawbridge is operating properly. While the master of a ship may not heedlessly steer the ship into a closed drawbridge, he may approach carefully on the assumption that duties imposed upon bridge personnel will be performed in a timely fashion, in the absence of a signal from the bridge to the contrary. The right of a ship to attempt passage of a drawbridge becomes well-nigh absolute when the bridge personnel, by means of affirmative conduct, extend invitation to proceed in response to the vessel's signal. It should be noted that this Court also cited with approval the case of *Clement v. Metropolitan West Side Elevated Railway Co., supra*. The court also stated that a closed drawbridge without more, or the display of a visual signal indicating that the draw is closed, does not suffice to serve notice upon the pilot or master of an approaching vessel that it will not be timely opened. Viable standards and reasonable prudence, applied to the totality of the circumstances, determine the allocation of fault in each instance. The court cited with approval the case of *The Majestic* (4th Cir. 1936), 80 F.2d 879, and *Munroe v. City of Chicago* (7th Cir. 1912), 194 F. 936.

Based on the facts presented to this court at the trial, there is no evidence that the vessel itself violated any

standard, law, or regulation. While the conduct of shining the light upon the bridge tender's station may have contributed in some manner to the accident, it has not been shown that the shining of the light was in any way a violation of procedure or standard law regulation. In addition, although the pilot did not immediately begin maximum efforts to slow down when he first became concerned about the bridge not opening, it has not been proven that this violated any applicable law or standard. In fact, the standard evidently allows the ship to approach within 300 feet of the bridge before giving the signal to open it. There was little, if any, evidence that the barge was moving at too great a speed. Therefore, we find no liability on behalf of the pilot or barge operator as a result of evidence produced before this Court. We therefore do not apply the equal-division rule.

As we previously stated, the ruling of the commissioner of this Court prohibited the Respondent from producing evidence as to the alleged or possible negligence of the yacht owner in mooring his boat. However, we do not feel that this evidence is necessary in order to have a complete resolution of the issues before this court. We do find negligence on the part of the bridge tender, and therefore on the Respondent, the State of Illinois.

We now must consider the specifics of the Claimants' request for relief. In count I, the Claimants sought recovery for an amount of money as the assignee of the Seaghost owner's claim against the Respondent. The Claimants received said assignment by paying the owner of the yacht and his insurer the amount of $10,750. In return, the owner signed a covenant not to sue and assignment for the Claimants' benefit.

In count II, the Claimants asked the court to award them $12,196 for court costs and attorney fees which

were spent in defending the lawsuit filed against them by the owner of the yacht. In addition, the Claimant wants prejudgment interest on both of the above amounts. The Claimant cited the case of *Lake Front Realty Corp. v. Lorenz* (1960), 19 Ill. 2d 415, 421-23, an Illinois Supreme Court case which analyzed the issue of prejudgment interest against governmental entities. That case was cited with approval by the Court of Claims in *Toombs v. State* (1977), 33 Ill. Ct. Cl. 205. Illinois has long taken the view that interest cannot be allowed unless a statute expressly provides for such interest. Accordingly, in *Toombs* this Court denied prejudgment interest on the grounds that it was recoverable only if authorized by statute. We, however, have already held that admiralty law governs this claim. As such, we must use admiralty law with all its traditional rules and procedures. Admiralty law provides for prejudgment interest. Therefore, we will allow prejudgment interest in this claim. Prejudgment interest is granted under the general law in admiralty cases that "prejudgment interest is permitted in the discretion of the trial court and should be granted unless there are exceptional or peculiar circumstances." *Federal Barge Lines, Inc. v. Republic Marine, Inc.* (8th Cir. 1980), 616 F.2d 372.

There is no doubt that the Claimants, in settling the lawsuit with the owner of the yacht, received an assignment of their rights. The owner of the yacht received $10,750 from the Claimant as payment for their damages. Claimants argue that they are now entitled as the assignee of the yacht owner to the entire amount of damages, not just the $10,750, or a portion thereof, they paid to the owner of the yacht. They cite as authority a case reported in American maritime cases, *Consolidated Grain & Barge Co. v. Chicago & Northwestern Transportation Co.* (S.D.

Ill. 1981), 1983 A.M.C. 90. Assignments of causes of action are permitted under maritime law. (*American Commercial Lines Co. v. Valley Line Co.* (8th Cir. 1976), 529 F.2d 921.) It is generally recognized that an assignee stands in the shoes of his assignor and can recover what the assignor could have recovered. However, must we apply those rules in connection with the Court of Claims rules which require exhaustion of remedies and the set-off. Since the yacht owner has already received $10,750, that figure must be set off against the total amount of damages. The Claimant sought recovery of $18,876 in their complaint, and $22,888 in their brief. We will use the latter figure as a more appropriate figure for damages. Subtracting $10,750 from $22,888, we come up with a figure of $12,138 as possible remaining damages available to the Claimant as assignee of the yacht owner. We award that to the Claimant, along with prejudgment interest at the rate of 5% from the date of the accident. Your award under count I is $12,138, plus prejudgment interest of $7,958.04, for a total award of $20,096.04.

The remaining issue before this Court is count II, which requests attorney fees and court costs based on a theory of indemnity under admiralty law. This court has held in one case that attorney fees are recoverable against the State of Illinois. That case, as cited by the Claimant, is *Douglas v. State* (1977), 31 Ill. Ct. Cl. 499. There this Court allowed attorney fees incurred by the claimant in defending a contract action which was brought because of the conduct of the State of Illinois. The Court can see little distinction between the rationale used by this court in *Douglas* and the factual situation in the present case. If we apply maritime law, clearly attorney fees would be allowable under indemnity theory. However, we do not feel that this is a case of indemnity. As we understand the

rule of indemnity under maritime law, a non-negligent or secondarily negligent party who makes a payment to a tort victim is entitled to indemnification from the party whose active or primary negligence caused the injury. (*Tri-State Oil Tool Industries, Inc., v. Delta Marine Drilling Company* (5th Cir. 1969), 410 F.2d 178; *United States v. GTS Adm. Wm. Callaghan* (S.D. N.Y. 1986), 643 F. Supp. 1483.) Also under admiralty law, a party who pays more than its proportionate share of liability to the victims is entitled to contribution from other tortfeasors. (*Griffith v. Wheeling-Pittsburgh Steel Corp.* (3d Cir. 1979), 610 F.2d 116, 129-130.) There is no doubt that recoverable damages in an indemnity action include costs and attorney fees reasonably incurred by the indemnifiee in defending claims for which the indemnifier is determined to be responsible. *United States v. GTS Adm. Wm. Callaghan*, 1484-1485.

The problem in this case, however, is that we cannot hold as a matter of law that the barge operator is non-negligent, or secondarily negligent. Although as we have previously stated, there was insufficient evidence of negligence on the part of the barge operator produced at the trial before this court, they settled their case with the owner of the yacht company thereby admitting culpability. They settled for $10,750, which is roughly 50% of the damages. If we average the amount sought in the Claimant's original complaint, and the amount of the brief, we come up with $20,882. $10,750 is in fact in excess of half of that figure. We take the settlement, and the money paid, as admission of partial liability on behalf of the towboat operator. In addition, if the barge operator is going to recover on a theory of indemnity, the burden of proof as to whether they were non-negligent, or secondarily negligent, was on them.

In addition, the Claimant asked for in excess of $12,000 for attorney fees and court costs in defending the case in which they settled for $10,750. Attorney fees and court costs must be *reasonably* incurred. Therefore, while we find that attorney fees and court costs would be available to a claimant before the Court of Claims under maritime or admiralty law, we find there is insufficient evidence before this Court to make an award on the basis of indemnity.

For the reasons above stated, we award the Claimant the amount of $12,138, plus $7,958.04 for prejudgment interest at the rate of 5% from the date of the accident through June 20, 1994. The total award is $20,096.04.